PEOPLE v. BUTTS.

1. EMBEZZLEMENT—OFFICERS OF CORPORATIONS—INTENT.

Under 3 Comp. Laws, § 11591, providing for the punishment of any officer of an incorporated company who embezzles or fraudulently converts to his own use any money of the company coming to his possession, an officer who designedly appropriates any such funds to his own use is liable, though he may have intended to return them.

2. SAME—DEFENSES.

And it is no defense that such misappropriation was with the knowledge and apparent acquiescence of one or more of the directors of the corporation.

3. SAME.

The secretary of a corporation cannot escape liability under said statute by the fact that; under the by-laws of the company, the treasurer was the custodian of its funds, where such by-laws were disregarded in the conduct of the business, and the funds converted actually came to the possession of the secretary.

Exceptions before judgment from superior court of Grand Rapids; Newnham, J. Submitted March 5, 1901. Decided September 25, 1901.

William M. Butts was convicted of embezzlement. Affirmed.

*L. B. Gardner* and *McGeorge Bundy*, for appellant.

*Horace M. Oren*, Attorney General, and *Frank A. Rodgers*, Prosecuting Attorney, for the people.

MOORE, J. An information was lodged against the respondent, reading as follows after the formal heading:

"Frank A. Rodgers, prosecuting attorney for the county of Kent, aforesaid, for and in behalf of the people of the State of Michigan, comes into said court, in the May term thereof, A. D. 1900, and gives it here to understand and be informed that one William M. Butts, late of the city of Grand Rapids, of the county of Kent, on, to wit, the 1st day of March, 1899, at the city of Grand Rapids, county of Kent, aforesaid, being then and there an officer, to wit, secretary, of the Worden Grocer Company, an incorporated company organized and existing under and by virtue of the laws of the State of Michigan, and not being then and there an apprentice nor other person under the age of sixteen years, did, by virtue of his said employment, then and there, whilst he was such officer of said incorporated company, as aforesaid, receive and take into his possession certain money to a large amount, to the amount of, to wit, nine thousand (9,000) dollars, and of the value of

nine thousand (9,000) dollars, of the property of the said
Worden Grocer Company, the incorporated company afore-
said, and which said money came to the possession of the
said William M. Butts by virtue of said employment, and
the said money then and there fraudulently and feloniously
did embezzle and convert to his own use, without the con-
sent of the said Worden Grocer Company, the incorporated
company aforesaid, his said employer; and the said prose-
cuting attorney further gives the court to understand and
be informed that the said William M. Butts then and
there, in manner and form aforesaid, the said money, the
property of the said Worden Grocer Company, the incor-
porated company aforesaid, his said employer, from the
said Worden Grocer Company, the corporation aforesaid,
feloniously did steal, take, and carry away, contrary to
the statute," etc.

The respondent was tried by a jury, and convicted.
The case is brought here on exceptions before sentence.

There are 145 assignments of error: The case is greatly
simplified by the testimony of the respondent, who was a
witness in his own behalf. The record discloses that,
during the temporary absence in Chicago of the respond-
ent, a large discrepancy was found between the cash
account as kept by him and the cash on hand. A tele-
gram was sent to him, asking his return to Grand Rapids,
and he came at once. An interview was had between
him and the officers of the company, which it is not neces-
sary to detail. Shortly after this, respondent had at least
two interviews with Judge Wanty, who was acting as
the attorney for the company. Upon the trial Judge
Wanty testified as to what was said at the interview of
October 19th in part as follows:

"I asked him what the shortage was, and he said that
the books now showed something between $38,000 and
$39,000; and I asked him if any one took it—any of this
money—except himself, and he said 'No,' he was respon-
sible for it, but that he was quite sure there would be some
errors found that would reduce this amount; and I asked
him how much he took, and he said he took, he should
think, about $10,000; and then I asked him again what
he did with it, and he replied that the money he received

for his salary he turned over to his wife every Saturday night; got it in an envelope; and that everything outside of the actual living expenses at the house, for which this was expended, he took the money from the company from time to time to pay; and he said that he had sent his father money enough so that he had practically kept his father's family, who lived in Ohio, and that money he had taken from the company, and these investments,— his insurance policies.  He said that he had had doctors' bills that had amounted to, some years, as much as $300, which he paid; but he said that the whole amount that he had taken did not amount to as much as the books show.  *  *  *  I then asked him what he had done with this money, and he said nothing any further than what he had said; and I said then, 'The impression is that you have been dealing on the Chicago market in margins, in pork or wheat or something of that sort;' and he said, 'No,' he had not.  *  *  *

"*Q.* Do you remember, Mr. Wanty, in any of these conversations, of asking Mr. Butts anything in regard to his private account upon the books ?

"*A.* Yes, sir; and I think that was in the first conversation.  I asked Mr. Butts if any of this money had been charged to him.  I asked him first if he had an account on the books, and he said, 'Yes, I have an account on the books, but it refers only to a lawsuit;' and I said, 'Was any of this money charged to you on the books ?' and he said, 'No, we pay by the envelope system, and no money that was paid to me for my salary, or any of those sums that I took, have ever been charged to me on the books.'

"*The Court:* I would ask if this last reply, 'None of this money was charged on the book,' did that have reference to his salary, or what ?

"*A.* He said that neither his salary nor any other money that he had taken was charged in an account against him on the books."

Mr. Butts, among other things, testified as follows:

" I was one of the directors and secretary of the Worden Grocer Company from 1895 to the 16th of October, 1899. At the time the company was organized, C. F. Rood, N. F. Avery, W. F. Blake, W. L. Freeman, W. D. Telford, C. W. Garfield, and myself became the directors.  A. E. Worden was president, W. D. Telford vice-president, W. L. Freeman treasurer, and myself secretary.  *  *  *

" *Q.* I understood you to say that you told Mr. Wanty substantially as he told it here upon the stand?

" *A.* Yes, sir.

" *Q.* Judge Wanty testified that you told him that you gave your wife your salary, as you drew it weekly, for the current expenses of the house.

" *A.* Yes, sir.

" *Q.* That was true, wasn't it?

" *A.* Yes, sir.

" *Q.* That you paid your coal bills, and your doctors' bills, and all of your personal expenses out of money that you took from the Worden Grocer Company. That is true, isn't it? Now, I am referring to these six months from March 1st to September 1st.

" *A.* That is substantially right; yes, sir.

"*Q.* How much money did you spend for insurance from March 1 to September 1,—March 1, 1899? I will state now, whenever I inquire of you about any transaction in this regard, unless I especially mention it, I mean the period covered by this information, from March 1 to September 1, 1899.

"*A.* Why, I think, about $75 or $80 during that period.
\*   \*   \*

"*Q.* That was $75 or $80 you took from the Worden Grocer Company?

"*A.* Yes, sir.

"*Q.* How did you take it?

"*A.* Currency.

"*Q.* Out of the drawer?

"*A.* I presume I did, or out of the safe.

"*Q.* You are not able to tell the jury whether you took it out of the drawer or out of the safe?

"*A.* I could not say; no, sir.   \*   \*   \*

"*Q.* Did you buy any coal during that time?

"*A.* Yes, sir; I think I did.

"*Q.* Where did you get the money to pay for that?

"*A.* The Worden Grocer Company.

"*Q.* Did you take that in currency?

"*A.* I presume I did; yes, sir.

"*Q.* How much did you pay for the coal?

"*A.* Well, I generally paid, I presume, $15 or $25. I generally bought two or three tons at a time.

"*Q.* You are not able to tell this jury how much money you took during that period for coal for your own private family purposes?

"*A.* I say probably $15 or $25.   *   *   *

"*Q.* You sent your father during that period $315?

"*A.* Yes, sir.

"*Q.* Where did you get that money?

"*A.* The Worden Grocer Company.

"*Q.* Did you take it in currency?

"*A.* Yes, sir.

"*Q.* Where did that money come from,—from what source?

"*A.* Why, it came in the general run of business; from the customers who paid their bills, generally.

"*Q.* Now, can you tell any other bills that you paid during that period besides the money that you put into the Cycloid Company and the mail-bag business and the air-gun business?

"*A.* Yes, sir; I think I paid a doctor's bill along about July 1st.

"*Q.* How much?

"*A.* My recollection is that my bill was about $90.

" *Q.* And where did you get that money?

" *A.* The same place.

" *Q.* From the Worden Grocer Company?

" *A.* Yes, sir.

" *Q.* Took it in currency out of their money?

" *A.* Yes, sir.

" *Q.* To pay your doctor?

" *A.* To pay my doctor.

" *Q.* Can you tell any other money that you took out of the money of the Worden Grocer Company that you have not mentioned?

" *A.* Why, there would probably be no doubt some items like three or four or five or ten dollars for my own personal expenses.

" *Q.* You took that out of the Worden Grocer Company?

" *A.* Yes, sir.

" *Q.* Now, can you think of any other moneys that you took out?

" *A.* Outside of the investments in these different companies, do you mean?

" *Q.* Yes.

" *A.* No, sir; I don't.

" *Q.* Now, as a matter of fact, whenever you wanted any money for your private use, you went to the drawer and took it, didn't you?

" *A.* Yes, sir.

" *Q.* You took whatever you wanted, whether it was $90 to pay your doctor, or $5 or $10 for your personal expenses, you went and took it?

" *A.* Yes, sir.

" *Q.* And you are confident that that amount of money that you took in that way during this six months amounted to something like $1,500?

" *A.* Yes, sir; about that."

This testimony discloses, as plainly as words can express, that, while respondent was secretary of the company, funds belonging to the company came into his possession, which he appropriated to his own use; not inadvertently and unintentionally, but designedly and intentionally, knowing the funds belonged to the company, and not to himself. Taking his own version of the transaction, there is not a single element of the offense described by the statute lacking. Act No. 114, Pub. Acts 1897 (3 Comp. Laws, § 11591); *People* v. *Warren*, 122 Mich. 504 (81 N. W. 360, 80 Am. St. Rep. 582). It is true, the respondent says he intended to return the money, but that does not do away with the offense. It is doubtless true that nearly every employé who misappropriates funds intends to return them to his employer, and to do this before the misappropriation is discovered. But this intention does not prevent the act from becoming a crime. The crime consists in the intentional appropriation of the money by the employé of the employer. It is true, too, that respondent claims that one or more of the directors of the company knew what he was doing, and did not object to it. This is denied by the other officers of the company, but, whether true or false, it does not excuse the respondent. Two or more of the directors of the company could not appropriate the funds of the company to their own personal use, and be justified in doing so. The judge did not charge the jury that the testimony of the respondent made out a case against him, but left the question of intent to the jury. This was quite as favorable to the respondent as he had a right to ask. *People* v. *Hawkins*, 106 Mich. 479 (64 N. W. 736); *People* v. *Schottey*, 116 Mich. 1 (74 N. W. 209).

But one other question calls for discussion. The respondent introduced in evidence sections 14 and 15 of the by-laws of the company, which read as follows:

"SEC. 14. The secretary shall keep a record of all proceedings of stockholders' or directors' meetings. He shall give all necessary notices. He shall be the custodian of the seal, and affix the same to all documents when necessary. He shall attend to the issuing of the certificates of stock, and shall keep a record of all stockholders, their respective residences, and the number of shares held by each, and shall perform such other duties as may be assigned to him by the board of directors.

"SEC. 15. The treasurer shall be the custodian of all notes, deeds, and valuable papers belonging to the said corporation; shall collect and receive all money due this corporation. He shall keep proper books of accounts, and a faithful record of all property of this corporation that may come into his possession, and shall cause an annual inventory to be taken, and shall have the same and all other information requisite to the full understanding of the financial condition of said corporation at each annual meeting of the stockholders, and shall perform such other duties as the directors may assign to him."

It is insisted that the treasurer of the company was the custodian of the funds, and the secretary was not, and the funds misappropriated by the respondent did not come into his possession by virtue of his office as secretary, and therefore he is not guilty. It is true, the by-laws prescribe the duties of the two officers. The record, however, discloses that in the practical management of the business no attention was paid to these by-laws. The treasurer did not in fact collect and receive the moneys due the corporation. They were nearly all of them received by the secretary, and some of them were misappropriated by him.

The other questions raised by counsel have been examined, but we deem a discussion of them unnecessary. The verdict is affirmed, and the case will be remanded to the court below, with instructions to proceed to judgment.

MONTGOMERY, C. J., HOOKER and GRANT, JJ., concurred. LONG, J., did not sit.