[Crim. No. 3668. In Bank.—January 31, 1934.]

THE PEOPLE, Respondent, v. JAMES A. TALBOT et al., Appellants.

Monroe B. Kulberg, Clare Woolwine, Leonard Wilson, Bourke Jones, James T. Boyle, Forrest F. Murray, Eugene D. Williams, Jerry Giesler, Edwin V. McKenzie and Walter H. Linforth for Appellants.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THE COURT.—A hearing was granted in this case after decision by the District Court of Appeal, Second Appellate District, Division Two, to consider the question whether the appropriation of corporate funds by the defendants was made with fraudulent intent, an element necessary to constitute embezzlement. We have painstakingly re-examined the record on this issue. Certain evidence tended to show that defendants were not conscious that their acts amounted to embezzlement even if they did constitute bad business practice. The record shows that each of the defendants and numerous employees had drawing accounts with the corporation; that the withdrawals by defendants were made openly, with no attempt at concealment; that the canceled checks were returned to the corporation; that defendants were charged on the books with all of the expenditures; and that no manipulation of accounts took place. It is further contended, and we may assume that it is true, that the practice of making advances of this sort to corporate officers and employees during this period was common, not

only in the Richfield company but in other corporations as well. The prevalence of this unlawful practice cannot, of course, justify it.

These and other facts were before the trial court, and that court was permitted to draw the inference of fraudulent intent from the admitted fact that the funds were appropriated and used for the personal purposes of the defendants. In this state of the record, the appellate court may not disturb the findings and judgment.

We therefore adopt the opinion prepared by Mr. Justice *pro tem.* Archbald, of the District Court of Appeal, as the opinion of this court. It reads as follows:

"James A. Talbot, Clarence M. Fuller and Raymond W. McKee were charged in count I of an indictment with conspiracy to commit the crime of grand theft, and in the remaining nine counts thereof they were charged with nine separate offenses of the same nature. The defendants were tried jointly on all counts before the court without a jury, the trial resulting in an acquittal of all three on the charge of conspiracy. Talbot was found guilty on counts II and VI, Fuller guilty as to counts III, IV, V, VII, VIII and IX, and McKee guilty under count X. Each defendant was found not guilty as to all counts other than the ones upon which he was convicted. From the judgments of conviction entered upon such findings, and from the orders denying their respective motions for a new trial, defendants have separately appealed.

"At the time the nine alleged acts of grand theft were committed, Talbot was chairman of the board of directors of the Richfield Oil Company of California, Fuller was president and McKee a vice-president and assistant to Talbot. As chairman of the board, Talbot had charge of financing and production, Fuller of refining and marketing and McKee of accounting. The amount which the defendants are charged in the first count with having conspired to take from the company is $245,325, which is the sum total of the nine overt acts of taking set out in said count. The amounts charged in counts II to X, inclusive, as having been taken by defendants, and the dates on which they were respectively taken, are the same as alleged in count I with reference to the nine overt acts, and each is the amount of a check drawn against the funds of said company.

"Prior to becoming chairman of the board of directors of the Richfield Oil Company, Talbot was the president of that corporation, the by-laws providing that the president should have 'general and active management of the business of the corporation'. When the office of chairman of the board of directors was created, an amendment to the by-laws was adopted providing that such chairman should 'share with the president in the general management of the business of the company and the direction of all other officers of the corporation'. The transcript of testimony herein impresses the reader with the fact that the very general powers thus delegated were used to their utmost by Talbot, when president of the company, and by Talbot and Fuller later. As one witness expressed it, 'it was more or less a two man company', and apparently the directors reposed 'absolute confidence' in them. Counsel in their briefs agree that the head of the company exercised 'almost autocratic powers' in handling its affairs, from the beginning to the calamitous end. In fact, the only limit that seems to have been imposed on such autocratic powers by the board of directors was in July of 1929, when an amendment to the by-laws was adopted providing that 'no single item of capital expenditure shall be made by the company in excess of $50,000' without the approval of one of the two representatives of certain investment bankers on the finance committee of the institution.

"With this preamble we shall discuss the case of each appellant separately.

### "Appeal of J. A. Talbot.

"Count II of the indictment, on which this appellant was found guilty, involves a check of the Richfield Oil Company in the sum of $50,000 dated October 2, 1929, payable to the order of Ingoldsby-Giles & Company, a stock brokerage firm in Los Angeles. There is testimony to the effect that this check was issued at the request of Talbot, through McKee, and that Talbot directed that it be charged to his account on the books of the company, but also to charge Fuller's account with $25,000 of it, crediting his, Talbot's, account with a like amount. Talbot testified that he ordered his secretary to send a check for $50,000 to the brokerage firm but that he did not know until later that

a Richfield check was sent. His secretary, however, testified that Talbot called her from San Francisco and told her that a Richfield check had been sent to Ingoldsby-Giles & Company, to charge it to his account and to advise the brokerage concern to credit him with $25,000 and Fuller with $25,000. Appellant Talbot had an account with the brokerage firm called 'J. A. Talbot No. 7 Account', in which one Newberger, also a director of the Richfield Oil Company, was jointly interested, and also a private account. The brokerage house also carried an account called 'Richfield Employees' Account', in which was kept the stock transactions of several officers and employees of the company. Prior to October 2d, money was requested by the brokers 'principally for the adjustment of said No. 7 account'. Talbot owed said firm on his personal account, on September 30, 1929, $74,024.10, and was short 360 shares of common stock of the Richfield company of the then approximate market value of $40 per share. Appellant Fuller owed the same firm on October 1, 1929, the sum of $306,709.73, and apparently the brokerage office was holding at the time, to protect such balance, 8000 shares of Richfield and 1000 shares of so-called Fokker stock. Fuller knew nothing of the credit of $25,000 to his account until later, when Talbot told him that it was necessary to advance it to the brokerage firm to keep the stock from being sold.

"Count VI, under which, also, Talbot was convicted, involves a check of the Richfield Oil Company dated October 24, 1929, in the sum of $50,000, payable to Fuller and endorsed by him, and signed by Talbot and McKee. Fuller told Talbot a day or so before the check was issued that the brokerage firm had about 17,000 shares of Richfield stock, apparently deposited to cover the account of the 'Richfield Employees', carried in the name of their New York correspondent; that margins were being demanded on such account and that the stock would be sold if the brokers did not get $100,000 immediately. Talbot arranged to have a loan made to Fuller of $50,000 by a certain bank and had the check for $50,000 issued which is the basis of count VI. Fuller then issued his check for $100,000 in favor of the brokerage firm. The $100,000 was not paid in time, however, to stop the sale in New York, but was apportioned to the "Employees' Account' with Ingoldsby-Giles & Company,

$59,000 of it going to the credit of Fuller in such account and the balance being apportioned between other names therein. There is evidence which indicates that appellant Talbot knew at the time Fuller's check was delivered by him to the brokerage firm that the 17,000 shares had been sold in the east and that he gave it to the firm because he had promised them $100,000.

''For the purpose of proving 'felonious intent' evidence was introduced of fourteen Richfield company checks ordered by Talbot aggregating the sum of $186,886.10, which apparently went entirely for the personal use of said appellant and not for any company expense. One of the checks was for $80,000, the balance of the purchase price of his private yacht, and others aggregating approximately $15,000 were for insurance thereon. The evidence also shows that such withdrawals were not authorized by the board of directors and were without the personal knowledge of the directors, with the possible exception of one of the $50,000 checks which was brought to the attention of director Newberger after it reached the hands of the brokerage firm above mentioned. It likewise appears that the withdrawals made were charged in the personal accounts of the respective officers, which were kept under the heading, 'Due from officers and employees. Account 418 A'. Up to 1927 it was apparently the practice of Peat, Merrick, Mitchell & Company, who audited the books of the Richfield company semi-annually, to submit a detailed report of such account to the board of directors, but after that year the practice was changed and two types of balance sheets were made, one 'a detailed report supporting the certified statements and giving in greater detail all of the assets and liabilities and discussing them', and the other a 'condensed balance sheet', which did not contain the details of the officers' accounts. This 'condensed balance sheet usually goes to the stockholders and is printed, published'. The detailed report 'is a sort of confidential balance sheet for the executive of the company' or 'for reference'.

''As bearing on the question of fraudulent intent and showing his good faith and lack of motive for wrongdoing as charged, appellant Talbot introduced evidence of his financial condition. Such evidence tended to show that his net worth on August 31, 1929, was approximately $5,439,000,

consisting of real estate, accounts receivable, secured and unsecured, life insurance and stocks. Among the latter was an equity in Richfield stocks amounting to $937,697 of the common stock and $24,440 of the preferred. His books showed $20,686.69 in cash in bank at that time. The dividends on his Richfield stock for the year 1929, in excess of $100,000, were left with the brokerage houses holding such stock. It was also shown that during the year 1929 Talbot paid into the market for the purpose of supporting the price of Richfield stock $1,577,571.18, and that $50,000 additional was paid to banks for the reduction of loans secured by Richfield stock, the market price of which had depreciated. Approximately $600,000 of this amount was borrowed from banks during the month of October alone, which went 'into the Richfield stock in the market'. The evidence further shows that at the end of 1929 the following real estate, as valued on this appellant's personal books, was unincumbered: His home, $350,000; Albany (¼ interest), $20,000; Long Lake, $5,000, and Bakersfield, $15,000, and that by October of 1930 the last of this real estate was incumbered. In January, 1931, Talbot filed a voluntary petition in bankruptcy, due, as he states, 'almost exclusively' to his effort to 'stabilize' Richfield stock on the market. On October 1, 1929, he held $58,736 shares of Richfield common stock, but sold about 18,000 shares during the month and bought 14,810 more. He was sold out of the difference by Plunkett & Lillienthal, certain of the brokers he was dealing with. Space forbids detailing anything except the most important points of the evidence.

"Appellant urges: (1) That the evidence does not show any criminal or fraudulent intent, but on the contrary affirmatively excludes such intent; that the court erred: (2) in finding him guilty as to count VI, whereas appellant Fuller was found not guilty thereon; (3) in admitting in evidence the 'disavowal' resolution of December 8, 1930; (4) in admitting evidence of other acts dissimilar in character and too remote as to time and conditions; (5) in permitting the introduction into evidence of the New York accounts without sufficient foundation laid; (6) in admitting into evidence certain inventories and testimony relating thereto; and (7) in not limiting evidence on behalf of a particular defendant to such defendant.

"(1) Appellant contends that it had been his custom, not only in the Richfield company but in other companies of which he had been an executive, to have drawing accounts against which were charged advances made to officers and employees; that both sums of money he is charged with taking openly and without concealment or any of the other usual *indicia* of fraudulent acts.

"The taking charged as grand theft was on the theory of embezzlement. Section 484 of the Penal Code, so far as material to such theory, provides: 'Every person . . . who shall fraudulently appropriate property which has been entrusted to him . . . is guilty of theft'. Section 503 of the same code defines embezzlement as 'the fraudulent appropriation of property by a person to whom it has been entrusted'. Section 504 provides that 'every officer, director, trustee, clerk, servant or agent of any . . . corporation (public or private) who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust . . . is guilty of embezzlement'. From these sections it clearly appears that fraudulent intent is an essential element of the offense of embezzlement, and such is the ruling of our courts. (*People* v. *Mitchell,* 74 Cal. App. 164 [240 Pac. 36]; *People* v. *Morley,* 89 Cal. App. 451 [265 Pac. 276].) Appellant says that the element of concealment is lacking, and points to the case of *People* v. *O'Brien,* 106 Cal. 104 [39 Pac. 325], as one emphasizing the necessity of concealment as a fact from which fraudulent intent may be inferred. We do not read the case that way. The court decided in effect that the evidence showed simply a case of disputed mutual accounts, which might have been embezzlement if the defendant had not acted openly and without any attempt at concealment.

"While secrecy or concealment is evidence of a criminal or felonious intent, nevertheless there may be embezzlement where the appropriation is openly made and consequently without concealment. (*People* v. *Connelly,* 4 Cal. Unrep. 858 [38 Pac. 42]; *Gurley* v. *State,* 157 Ark. 413 [248 S. W. 902; *Russell* v. *State,* 112 Ark. 282 [166 S. W. 540].)

"It is urged that such fraudulent intent must be shown by facts or circumstances independent of and in addition to

the act of conversion, and among other cases cited in support of the contention is *People* v. *Royce,* 106 Cal. 173 [37 Pac. 630, 39 Pac. 524]. In that case the treasurer of a corporation received a draft for $10,350 and deposited it in his personal account at a bank, notifying the bookkeeper of that fact. No depository bank had ever been named by the directors of the corporation. Three days after the deposit was made the company received from him the sum of $8,310.35. He was charged with embezzlement. The evidence apparently did not show what became of the balance or that defendant did not have it ready to be produced when called for, and there was no evidence .that a demand to produce was made upon him. Under such circumstances no felonious intent was shown.

''The element of felonious intent in every contested criminal case must necessarily be determined from the facts and circumstances of the case. (*People* v. *Kirk,* 94 Cal. App. 378 [271 Pac. 347].) In our opinion the law is well expressed in the case of *Manghan* v. *State,* 11 Ga. App. 427 [75 S. E. 512, 516], where the court says: 'An officer or agent of a corporation cannot take money of the corporation which is entrusted to him, or which comes into his possession by virtue of his office or agency, and use it even temporarily for his personal benefit and avoid criminal responsibility by calling it a loan. The law calls such a transaction a wrongful conversion, from which a fraudulent intent can be inferred'. (See, also, *People* v. *Lyon,* 33 Hun (N. Y.), 623, 637; *People* v. *Schrager,* 315 Ill. 169 [146 N. E. 151, 154]; *Orr* v. *State,* 6 Ga. App. 628 [65 S. E. 582]; *Commonwealth* v. *Tenney,* 97 Mass. 50, 58; *State* v. *Leicham,* 41 Wis. 565; *People* v. *Butts,* 128 Mich. 208 [87 N. W. 224]; *State* v. *Merkel,* 189 Mo. 315, 319 [87 S. W. 1186]; *State* v. *Kortgaard,* 62 Minn. 7, 16 [64 N. W. 51, 55]; *National Life etc. Ins. Co.* v. *Gibson,* 31 Ky. Law Rep. 101 [101 S. W. 895, 897, 12 L. R. A. (N. S.) 717]; *Gurley* v. *State, supra; Patterson* v. *United States,* 39 App. [D. C.] 84, 90.)

 ''The crime of embezzlement is purely statutory, and legislation with reference thereto resulted from the failure of prosecutions under the common law crime of larceny to reach a case where the possession of property was obtained by consent, and the resulting breach of trust by the agent, officer or bailee, although it as effectually deprived the

owner of his property as though it had been taken out of his possession by stealth, was not punishable at common law. In the case of *People* v. *Gordon,* 133 Cal. 328 [65 Pac. 746, 747, 85 Am. St. Rep. 174], speaking of our code definition of embezzlement, the court says: ██ 'The essential elements of embezzlement are the fiduciary relation arising where one intrusts property to another, and the fraudulent appropriation of the property by the latter.' There would seem to be no hidden meaning in the use of the word fraudulent in such definition. It is true that where, as in the cases of *People* v. *Royce,* 106 Cal. 173 [37 Pac. 630, 39 Pac. 524], and *People* v. *Page,* 116 Cal. 386 [48 Pac. 326], the money is deposited in the personal account of the defendant but no evidence is introduced showing that it was ever converted to his own use, no 'fraudulent appropriation' is shown. But we are sure that if the evidence in such cases showed, without question, an appropriation of the money to the personal use of the defendants, and contrary to the purposes of the trusts, the fraudulent intent would have been imputed to them.

██ "One of the definitions of 'fraud' given by the Standard Dictionary is: 'Any act . . . that involves a breach of duty, trust, or confidence, and which is injurious to another, or by which an undue advantage is taken of another,' and an act is declared to be fraudulent that is characterized by fraud. ██ We think the legislature used the word 'fraudulent', in its definition of embezzlement, to distinguish an 'appropriation' by an agent of money or property under circumstances that might be merely tinged with suspicion as to the agent's intent, from an appropriation for purely personal uses of the agent, as contrasted with the purpose for which the money or property was entrusted to him. ██ In other words, in every case where the officers of a corporation who are necessarily entrusted with the money and property of the concern use it, knowingly and intentionally, for their own purposes, there is a 'fraudulent appropriation' thereof which is termed embezzlement by the statute, and the fact that such officers intended to restore the money or property is of no avail to them if it has not been restored before information laid or indictment found charging them with embezzlement (Pen. Code, sec. 512), and even if prior to the bringing of such

charges the officers *voluntarily and actually* restore the property, such fact does not constitute a defense but merely authorizes the court in its discretion to mitigate the offense (sec. 513). It would seem that the legislature here has shown in very clear terms that it is the immediate breach of trust that makes the offense, rather than the permanent deprivation of the owner of his property.

"In the recent case of *People* v. *Gordon,* 206 Cal. 29 [273 Pac. 568], the defendant, an attorney, was entrusted with the collection of amounts due on certain bonds. The money was collected but only about half of it was paid over to his client by the defendant. When the balance was demanded the attorney claimed that he was to receive one-half as his fee for collection. The court there said: 'Defendant claims there is no showing of fraudulent intent on his part, as his actions were unconcealed and were based on his understanding that he was to receive half of the sum collected. In our opinion, however, the evidence was amply sufficient to establish the fraud. Defendant's testimony at most raised a conflict which was resolved by the verdict of the jury in favor of the people. The jury was properly instructed on the subject of the element of specific intent, and its determination of the matter is final.' We think the reasoning of that case applies with great force to the one before us. Under the evidence produced by the prosecution serious misappropriations of funds of the corporation are shown, contrary to all authority given and in violation of the trust imposed. ▇ The fact that this appellant intended to repay the money taken, or was amply able to do so, is of no avail in the face of the fact that the money was not replaced prior to indictment found. ▇ The claim that he used the money in an honest effort to stabilize the price of stock on the market, for the benefit of the corporation and its stockholders and not for the selfish purpose of making his own holdings more valuable, created but a conflict in the evidence which the court, trier of the facts, decided against him, and that determination is final so far as an appellate court is concerned. ▇ Neither does the claim that appellant had been accustomed to drawing and using the funds of the corporation for his personal needs, having such withdrawals charged to his personal account and eventually paying the money back by credits due him

or payments made by him, relieve the acts from the stain of criminality. Nor can we subscribe to the doctrine that long-continued wrongdoing sanctifies or purifies such conduct. Even if all of the directors of the corporation knew of such custom, the wrong was not made right. They were each charged with the trust to use the funds of the company for. company needs, and it might be seriously questioned whether an authorization or ratification by the board of such acts would not have resulted in involving the directors rather than in excusing the officers. That the trial judge understood the law as to intent clearly appears from the record, and in our opinion the evidence amply sustains the conclusion he must have reached thereon.

"(2) The evidence shows that appellant Talbot signed the check on the Richfield company for $50,000, which was given to appellant Fuller and went into the $100,000 check given by the latter and which there is evidence to show was finally turned over to Ingoldsby-Giles & Company by Talbot himself, in accordance with his promise to give them that sum. It is to be remembered, also, that appellant Talbot arranged for the loan to Fuller which made up the balance of the $100,000. If the evidence under the point now under consideration affects the parties jointly charged alike, the rule invoked by this appellant applies. However, where there is the slightest difference in the testimony as between two jointly tried, the jury or the judge, as the trier of facts, may weigh such testimony and make such difference (*Davis* v. *State,* 75 Miss. 637 [23 So. 770]); and when that is done, the fact that the evidence also involves the other to some extent will not relieve the one of culpability. We think such rule applies here. (*People* v. *Edwards,* 72 Cal. App. 102, 117 [236 Pac. 944].)

"(3) We see no error in admitting the so-called 'disavowal' resolution in evidence. It is true it was passed some time after the acts charged were committed, but it had some bearing on the question of whether they were done with the consent of the board of directors, and this in turn might have had some bearing on the question of the intent of appellant. In addition, each director had also testified that no consent was given.

"(4) We have heretofore indicated that in our opinion evidence of the several acts, introduced to show in-

tent, under the circumstances of this case had a direct bearing on the question of fraudulent intent. The fact that some of them were of a later date would not seem to make the admission of testimony concerning them erroneous. Bearing on intent as they do, they showed a continuous practice of the same nature both before and after the acts on which convictions resulted. Widely separated acts might not exclude the idea of inadvertence, but happening as they did here, they bear, in our opinion, even more directly on the question of intent.

"(5) We agree with appellant that the statement of the New York accounts should not have been admitted in evidence. While there is evidence showing that both appellants Talbot and McKee knew there was a discrepancy of some kind existing between the accounts of the Richfield Oil Corporation of New York, a subsidiary of the California corporation, and the parent organization, which resulted in the showing of certain expenses as assets and which inflated the profits of the company for the year 1929 as shown by the books, which in turn increased the bonus money divided among the executives, there seems to be no evidence connecting any of appellants with the making of the entries which resulted in such discrepancy. We therefore fail to see how the books themselves could have been properly used against them, much less a summary taken therefrom, the books not being present. But after an examination of the entire cause, including the evidence, we are forced to the conclusion that the judgment of the court would have been the same regardless of such error.

"(6) Over the objection of appellant evidence of certain changes made in the inventories on the direction of appellant McKee, which resulted in inflating the showing of profits of the company for the year 1929 and hence increased to a certain extent the bonuses paid on the profits shown for that year, was introduced. The only connection shown with such changes, so far as appellant Talbot is concerned, is that his office was in close proximity to McKee's, probably across the corridor, at the time they were made. The trial judge permitted the evidence to go in, although, as he stated, it would have to be connected up with all defendants and its materiality as bearing on intent shown, otherwise he would entertain a motion to strike. While

such changes in the inventories and consequent taking of increased bonus money might be the subject of a separate conspiracy, it could hardly be a part of the conspiracy pleaded, as that was limited to a definite sum, viz., the total of the amount taken by the several overt acts pleaded, none of which included any sums received by way of fictitious bonus payments. Possibly a conspiracy to take money by a different method might have some bearing on the intent with which the takings in the alleged conspiracy were consummated, but on that point we express no opinion. The fact remains, however, that apparently no motion to strike was made when all the evidence as to the changing of the inventories was concluded. Assuming that one had been properly presented and overruled—which ruling, however, so far as appellants Talbot and McKee are concerned, we are compelled to conclude the court would not have made—still we are of the opinion that such evidence did not in any way affect the judgment rendered by the court.

"(7) Appellant complains because his motion that the evidence of all witnesses called by a particular defendant be limited to that defendant was denied. Such motion was made almost at the close of this appellant's defense and prior to the introduction of evidence on behalf of his codefendants. The same motion was also made by appellants Fuller and McKee and the same ruling followed. Appellant Talbot cites as an example of the harm done him by the court's ruling the testimony of his codefendant McKee as to the issuance of the check involved in count II, stating that up to that time there had been no direct evidence to show that he, Talbot, personally requested the check to be issued. Prior to McKee's testimony both Talbot and his secretary had testified concerning such check, which testimony we have heretofore referred to. From such evidence the conclusion could readily be drawn that Talbot ordered the Richfield check to be issued and directed its application. The testimony of McKee was corroborative only, and we fail to see how Talbot could have been prejudiced thereby. Nor was he prejudiced by the testimony of McKee regarding the check for $100,000, which was admitted in evidence as against McKee only and which was rejected by Talbot, who told McKee he had made other arrangements, viz., the arrangements by which the $100,000 payment was made

through the $50,000 check which is involved in count VI and the $50,000 bank loan to McKee arranged by Talbot. The trial court was faced with a delicate situation, in view of the fact that a conspiracy charge was joined with several other joint charges. No motion was made for a separate trial of the conspiracy charge. In our opinion the court did the best it could under the circumstances, and we see no error in the ruling complained of.

### *"Appeal of C. M. Fuller.*

"Counts III, IV, V, VII, VIII and IX, upon which this appellant was found guilty, involve checks of the Richfield Oil Company which were charged to the account of Fuller on the books of the company as follows: Count III: Check for $50,325 dated October 2, 1929, used to pay personal obligation of Fuller and Talbot and to release 3500 shares of Richfield stock so that a larger personal loan could be obtained thereon. Count IV: Check for $5,000 dated October 4, 1929, used for personal expenses of Fuller. Count V: Check for $25,000 dated October 4, 1929, used to protect margin account of Fuller with stock brokers. Counts VII, VIII and IX involve three checks all dated October 29, 1929, one for $25,000, issued to Fuller, one for $10,000, issued to his secretary, and one for $15,000, issued to his assistant, Randall. The last two were deposited in the accounts of the payees, who gave Fuller their individual checks for the amount of those deposited by them, appellant depositing such individual checks in his own account. Fuller's explanation was that he did not want to deposit in his own account more than the $25,000 check of the company on the same day. He admits the use of the checks as stated.

"Appellant Fuller contends: (1) That inasmuch as the conspiracy count upon which he was found not guilty involves as overt acts the same checks for the misappropriation of which he was found guilty, it follows that he should have been found not guilty of the substantive offenses; (2) that there was no proof of the existence of the Richfield Oil Company as a corporation; (3) that subsequent acts were improperly admitted to show prior guilty intent; (4) that the prosecution is estopped to deny the right of appellant to withdraw such sums from the treasury of the company; (5) that the district attorney, 'as a representative of the

stockholders', is denied the right to accuse appellant of any criminal intent, as the monetary advances received established the relation of debtor and creditor; (6) that verdicts on several counts must not be inconsistent; and (7) that the evidence is insufficient to justify the verdict, as no criminal intent was shown, but good intent was proven.

██ "(1) An essential element of the first count was the criminal conspiracy, which was not included in the nine substantive offenses pleaded, so there was no jeopardy by reason of the verdict of not guilty on such count. (*People* v. *Clensey*, 97 Cal. App. 71 [274 Pac. 1018].)

██ "(2) We see no merit in this contention. It would hardly lie in the mouth of one profiting by funds unlawfully taken from an entity even pretending to act as a corporation to deny its corporate existence. Appellant could not have been misled under the circumstances, and it would seem to be immaterial whether the Richfield Oil Company was a corporation *de jure* or *de facto*, as it clearly appears it was the money of such company that was taken. However, the certificate of incorporation of such company was introduced in evidence without objection.

"(3) The contention raised under this numeral is answered in our discussion of the fourth point in the Talbot appeal.

██ "(4) There could be no estoppel on the part of the prosecution to deny the right of appellant to make withdrawals under the facts of this case.

██ "(5) We fail to see how the relation of debtor and creditor is established by the facts and circumstances presented, or how the district attorney could be prevented from prosecuting a criminal charge based on such acts. It is not shown that the stockholders were advised as to what was going on. The evidence is to the effect that since 1927, after which date the large withdrawals for private purposes were made, the details of account 418-A were not sent to the stockholders. Even such details as were sent them before would not put them on notice of the use being put to the withdrawals.

"(6) We see no inconsistency in the verdicts.

"(7) We have discussed this contention under the appeal of Talbot, and in our opinion the same conclusion must be reached here.

"In his reply brief appellant Fuller assigns as additional error the introduction in evidence of the statement taken from the books of the Richfield Oil Company of New York, and also the 'disavowal resolution'. We have discussed these both under the Talbot appeal, and in our opinion the conclusions there reached are applicable here.

### "Appeal of R. W. McKee.

"It is conceded by this appellant that he was an employee of the Richfield Oil Company of California and that the $15,000 mentioned in count X of the indictment belonged to such company; that such sum was technically or constructively in his possession and that it was applied by him to his personal use. On October 24, 1929, one G. A. Smith loaned McKee $15,000, which the latter gave to his stock broker in payment of margins demanded. A few days later Smith was arrested and charged with conspiracy to evade the gasoline tax, his bail being fixed in the sum of $15,000. Someone in Smith's office telephoned these facts to McKee and wanted to know if 'we' would furnish the bond. McKee then called the insurance department of the Richfield company and asked them to arrange it. He was informed that a check had to be posted for the amount of the bond, whereupon appellant ordered a check issued, on November 7, 1929, payable to the Fidelity & Deposit Company of Maryland. This money was later paid to Smith in satisfaction of McKee's loan. Apparently neither appellants Talbot nor Fuller knew of the issuing of the check or of the deposit of the bond until after it was done.

"Appellant McKee contends: (1) That the evidence is insufficient to support the judgment; that the court erred (2) in admitting evidence of subsequent withdrawals, (3) in admitting evidence of a mutilated check of the Richfield company for $100,000, (4) in admitting in evidence certain resolutions guaranteeing loans made by the Bank of Italy to certain groups of officers and employees and testimony concerning same, (5) in admitting in evidence the 'disavowal resolution' and (6) the New York statement.

"(1) The evidence shows that McKee was also convicted on a later indictment containing three counts charging withdrawals of $1,000, on September 28, 1929; $2,000, on October 4, 1929, and $2,000, on October 22, 1929. Appellant's

testimony shows withdrawals in 1929 of $33,450.13 and credits of $15,843.67, of which latter amount $11,045.07 is a bonus credit of date December 31, 1929. He was also credited with an additional bonus in February of 1930, which it is said was due him in 1929, and appellant urges that there was then paid back in 1929 an amount in excess of all withdrawals made, in view of the fact that the account had a debit balance in December of 1928 of $16,873.21. His debit balance on September 30, 1929, two days after the first withdrawal involved here, was $22,532.14, after receiving credits in September for an item of 'expense' of $494. The only other credits to the account in 1929 are as follows: October 31, 'Expense', $875; November 30, 'Expense', $426; December 31, 'Expense', $57.10, and the bonus of $11,045.07. In other words, the best that can be said of such showing is that appellant McKee intended to repay, which is no defense. Nor is actual restoration to be considered except in mitigation. (Sec. 513, Pen. Code.) We have considered this contention in the appeal of Talbot and see nothing in the facts with respect to this appellant that would change our opinion in that regard. McKee, as an officer of the company, was under Talbot, and made the withdrawal of $15,000 without even the latter's consent, although that could have availed nothing.

''(2) There was no error in admitting evidence of subsequent withdrawals.

''(3) The check mentioned on this point was issued at McKee's request, thinking Talbot intended to use it in connection with the $100,000 payment to Ingoldsby-Giles & Company. It was rejected by Talbot and a $50,000 check of the company used. Appellant was acquitted on the count to which such testimony relates, and we fail to see how any prejudice could possibly have resulted.

''(4) During the first week in November of 1929 appellant Talbot informed the treasurer of the Richfield Oil Company that he wanted to do something for certain employees in the purchase of stock, as a reward for faithful services and also because they had suffered rather heavily in loss of stock, and told him to see McKee and get the details of the plan. The treasurer interviewed McKee, who gave him a list of names of employees, among which was McKee's. The latter then either asked him to go to the Bank of Italy

and arrange for a loan of $50,000 or told him that arrangement had already been made. At any rate, the treasurer went to the bank and received a note for $50,000, which he had the several employees so to be helped sign. Subsequently the bank asked for a guarantee of the note and the request was conveyed to McKee, who later gave the treasurer a copy of what purported to be a resolution of the board of directors authorizing the execution of a guarantee of the instrument by the company and a guarantee purporting to have been executed pursuant thereto. The resolution was dated May 7, 1930, and the guarantee May 12, the treasurer delivering them to the bank. Later, the bank being dissatisfied with such resolution and guarantee, it was presented with others satisfactory to it. Certain checks of the company making interest payments on the note, issued at the request of McKee, were introduced in evidence. Later the bank demanded a payment on said loan, which demand the treasurer communicated to McKee, and a Richfield company check for $20,000 was drawn and sent to him for delivery to the bank. There was no renewal clause in the first guarantee, and the bank asked for another. This request was communicated to McKee by the treasurer, appellant saying, 'we will give it to them'. Shortly thereafter a purported resolution authorizing the guaranteeing by the company of the $30,000 balance due on said note and a guarantee thereof issued by the company were delivered to the treasurer, who gave them to the bank. Appellant asked the company's attorney to draw up the first resolution, and the latter advised him that in his opinion the board of directors had no power to make such a guarantee. McKee then told the attorney 'that was our instructions' and that he was not asked for advice. It was the introduction in evidence of these three sets of resolutions and guarantees of which this appellant complains.

"The money obtained on the $50,000 loan was added to the sum of $26,237.50 obtained by the same employees on another loan, and forwarded to the Bank of Italy in San Francisco to cover a draft drawn by appellant McKee for $76,237.50, with 2500 shares of Richfield stock attached. A loan of $100,000 was made by the same bank to this group of employees on November 15, 1929, out of which the $26,237.50 loaned was paid, and on April 3, 1930, a check

of the Richfield Oil Company for $25,000 was issued and applied on the $100,000 loan. Various other checks of the company were issued at the request of McKee and applied on said loan in payment of either interest or principal. Several of the directors of the company testified that at no time were the resolutions above referred to passed upon or approved by the board. Appellant urges that such guarantees and resolutions were not material to the conspiracy charge because of a date later than the completion of the conspiracy; that his connection with the procuring thereof was open and aboveboard and that, not being on the directorate, he knew nothing of whatever action was taken.

"The evidence is almost inextricably interwoven with the payment of interest and principal made with the company's checks of which this appellant had knowledge and which the trial court evidently considered the material part of the transaction. It would seem that, even though subsequent to the conspiracy, there was some evidence connecting joint action by Talbot and McKee in their issuance. It was brought to McKee's knowledge that in the opinion of the attorney for the company the directors had no power to make the resolutions or guarantees referred to. They were apparently executed without any actual meeting of the board of directors, which must have been known by McKee from his connection with their procurement, and, as the court said, might be evidence of other joint offenses indicating intent. In view of the finding of not guilty on count I the court certainly gave no weight to them on any joint charge, and we fail to see how they could have affected the individual charges on which appellant was found guilty.

"(5) In view of the testimony of each director that no consent was given to the withdrawals made, we fail to see where any prejudice resulted in admitting in evidence the so-called 'disavowal resolution'.

"(6) We have discussed this point as well as the preceding one in the appeal of Talbot, and the conclusions there reached, in our opinion, apply here."

In the oral argument, by special permission of this court, a point was presented which was not raised in the District Court of Appeal. This was to the effect that the opinion gives an unconstitutional interpretation to the embezzlement

statute. We are satisfied that no provision of the federal or state Constitution has been violated in this case.

The judgment and orders are affirmed as to each appellant.

Rehearing denied.