[Crim. No. 3508. Fourth Dist., Div. One. July 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN LARRY JONES, Defendant and Appellant.

Richard A. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Arthur B. Rosenfeld, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—John Larry Jones (defendant) appeals from a judgment imposing sentence for the crime of attempted robbery, of which he was found guilty by verdict. A second count charging conspiracy to commit the crime of robbery was dismissed after the jury failed to agree upon a verdict.

### The Evidence in Support of the Verdict

On February 7, 1968, defendant left his home in the morning to borrow Leon Jackson's Corvair automobile, leaving at home his wife and Walter Evans Taylor (Taylor).

Shortly after 10 a.m. of the same day, defendant, who was accompanied by Taylor, went into a pawnshop at Third and F Streets in downtown San Diego and pawned a record player. He and Taylor had driven there in the borrowed car.

Shortly after 12 noon of that day, defendant and Taylor drove again to Third and F, where Taylor, accompanied by defendant, went into the same pawnshop where Taylor pawned his .38 caliber pistol for $10. Taylor used the money to take care of a traffic ticket in National City.

During the day, defendant, defendant's wife, Bonita Jackson (Bonita), Taylor, Joe Robinson (Robinson) and Willy Herman Crosby (Crosby), who was known as "Stick Horse," spent time together at several places, one of which was known as Teen Post.

At about 5 p.m. of that day, defendant, Taylor, Robinson, Crosby and Bonita went in the borrowed car to the vicinity of Third and F, with Taylor driving. The car was parked on F Street between Third and Fourth Avenues. Taylor and Crosby went into the pawnshop where Taylor redeemed the pledged revolver for $11, of which $8 had been furnished by Crosby. They returned to the car carrying the pistol in a brown paper bag.

The first attempt to start the car was unsuccessful, so defendant alighted from the car and rocked it back and forth until Taylor was able to get the engine started.

Taylor then drove west to Third Avenue, a one-way street for northbound traffic, onto which he turned and from which he turned easterly onto E Street, one-way for eastbound traffic and the street next north of F; from E Street, Taylor went

south on Fourth Avenue, a one-way street for southbound traffic to G Street, one-way for eastbound traffic, the street next south of F Street; in the middle of the second block east of Fourth Avenue, which would be between Fifth and Sixth Avenues, Crosby said, ''Hold it, man, I just seen a play back there; make the block.''

In that context, ''play'' meant an opportunity for a robbery.

At Seventh Avenue, the next one-way street for northbound traffic, Taylor turned left and went to Broadway, one block north of E Street, west on Broadway to Fourth Avenue, passing by Sixth Avenue, one-way for southbound traffic, and the next street west of Seventh Avenue, turned left on Fourth Avenue to E Street, where he stopped for the red traffic light.

When the light changed to green, the car, driven by Taylor, waited a perceptible interval before it went into a left-turn to go east on E Street, passed a public transportation bus parked on E Street near the corner of Fifth Avenue, went through the intersection of Fifth and E, and was parked in a metered space on the south side of E Street between Fifth and Sixth Avenues. There Crosby, armed with Taylor's pistol, left the car, walked back to the parked bus, which had been standing at a terminal point of the route since 5:40 p.m. and was due to leave at 5:55.

Crosby entered the bus, displayed the weapon to Lelus W. Lanford, the driver, and demanded money. Lanford pointed behind Crosby and said, ''What are you going to do about this policeman behind you?'' Crosby turned his head and looked back; as he did so the driver, with his foot, propelled Crosby out the door, from which Crosby fell to the pavement, with the driver immediately behind. The driver shouted to bystanders and tried to hold Crosby, who broke loose and ran limping back on E Street toward the parked car.

At about 5:55 p.m. of February 7, James R. Shively, a San Diego police officer in uniform, driving a marked police patrol car, came onto E Street from Fourth Avenue and saw the commotion near the parked bus, was hailed by Lanford, who pointed out to him the fleeing Crosby as a man who had just tried to rob him and said the robber had a gun.

Crosby's head was shaved and he was wearing a fur Cossack cap.

Shively, as he proceeded east on E Street, saw Crosby enter the right rear of a parked light-green Corvair automobile. Shively brought his car to a stop alongside the parked Cor-

vair, alighted, and through a loudspeaker ordered the man who had just gotten into the right rear of the car to get out; defendant, seated in the right front seat, got out of the Corvair, was told to get back in and did so; Shively said his direction was to the man in the rear seat.

The others in the car were Taylor, behind the wheel, Bonita, in the center of the front seat, and Robinson and Davis in the rear.

Larry L. Griffin, a San Diego police officer, next came upon the scene in a car. He recognized the Corvair as a car that had stopped on Fourth Avenue at a traffic signal at the E Street intersection as he in his car did at the same time. Because the Corvair remained standing after the signal light went green as Griffin observed in his rear-view mirror after he had crossed the intersection, he swung around on F Street to Third Avenue, up Third Avenue to E Street and east on E.

After Griffin arrived, Shively removed Crosby from the car, searched him and found no gun. Crosby told Shively his name was Sims and asked what he was being arrested for; was told robbery; said "Are you arresting me because I had a gun?" and then said he didn't know anything about a gun; he didn't have one.

As Shively was removing Crosby from the car, defendant started to get out, and was told by Shively and Griffin to get back in.

Keith W. Enerson, the third police officer to reach the scene, came up when Crosby alone was outside the car. Two or three other officers arrived later. Enerson searched for the weapon and found it under the right front seat well forward and about in the middle of the lateral line of the passenger in the front seat.

Richard Dacy, one of the police officers, took charge of defendant after the latter was arrested by Griffin, and carried him to jail. He read to defendant from a printed form the advice required to be given by *Miranda* v. *Arizona*. After that had been done, defendant said he understood and was willing to tell his story to Dacy. En route to jail and at the jail parking lot defendant stated that a gun came across the front and under the front seat on his side where he was sitting, under the seat, and this was all he knew about it; he wasn't sure where it came from, but he did know that Mr. Sims had the gun.

The next morning at 9:45, at the jail, James B. Sing, a police officer, again advised defendant of the rights enunci-

ated in *Miranda* v. *Arizona*; was told defendant understood them and was willing to make a statement.

Defendant told Sing that he took Taylor to the latter's house to get something—he thought it was the gun which he had seen—drove Taylor to the pawnshop but did not go in with him; went in the car later with Taylor when Taylor and Crosby went to get the gun which defendant assumed was in a brown paper bag Crosby carried when he came back to the car; he heard the remark Crosby made about "a play," but did not know that Crosby, whom he referred to as "Stick," meant a robbery; when the car was parked he said "Stick" got out the right rear door and walked back westbound on E Street on the south side toward Fifth Avenue. He said Stick was gone three to five minutes and returned walking funny as if he was hurt. He said "Stick Horse" got back into the rear of the car and said, "You are just talking to me" and defendant said, "What do you mean by that?" It was explained that they were supposed to act as if they had just met Crosby and didn't know him, and they were just talking to him then. Defendant said he still had the door open and the officer shined the light in the car and "Stick Horse" dropped the gun over the seat on his shoulder. When Sing asked, "What did you do with the gun?" defendant said, "I didn't want the gun so I laid it down on the girl's lap that was sitting next to me." Defendant said, "Then the officer told me to get out of the car, so I did." Then the officer told "Stick Horse" to get out, and he did get out. Defendant said he had not known there was going to be a robbery.

### The Similar Offense

There was evidence of another offense committed on December 17, 1964, when two Negro men, one of whom wielded a gun, robbed a liquor store owner at about 10 p.m. Defendant was not either of the two robbers.

The liquor store was at 40th and University in San Diego. South of University, 40th Street becomes Wabash Freeway; about 3 miles south of University there is an exchange exit from Wabash Freeway to Highway 94 westbound.

The liquor store owner immediately called the police station. Martin G. Addington, a patrol officer, heard by radio from the police station a report of the robbery and a description of the robbers when he was about a mile south of the Wabash Freeway-Highway 94 interchange, to which he proceeded immediately by car and stationed himself at a point

just north of the interchange. Shortly he saw a car pass southbound on Wabash and turn off at the interchange. There were four Negro men in it and he followed it and brought it to a stop. He saw that the two men in the back seat resembled the description of the robbers he had received. Their names were Williams and Sims. The car was driven by a man named Smith. Defendant, who was in the right front, said the car was his and gave consent to Addington to search it, which the latter did and found what he thought was a Seconal pill in the car. There were now some eight people and several vehicles there on the highway.

Because they were on a high-speed freeway with eight persons standing alongside the freeway, and with three vehicles there, Addington decided, for reasons of safety, not to make a thorough search, but to take the four men to jail. They were placed under arrest and taken to jail. There Addington asked defendant if he might search the car further, and told defendant of finding the pill. Defendant said to go ahead, he had nothing to hide.

In the second search, made about an hour after the first, Addington discovered a make-shift compartment within the thickness of the seat-back, removed therefrom a pistol containing three cartridges and a paper bag containing the approximate amount of money taken in the robbery.

### CONTENTIONS ON APPEAL

Defendant's contentions on appeal may be summarized as follows:

There was a basic error in permitting evidence of the December 17, 1964 robbery, and further error in permitting evidence of the result of the search of defendant's car on December 17, 1964. The latter search is asserted to have been illegal, and the prior offense irrelevant to the proof of any issue in the case at bench.

The evidence was insufficient to support the verdict.

The failure of the jury to return a verdict on the conspiracy count creates an inconsistency with the verdict on the first count that is fatal to the latter.

### ALLEGED INCONSISTENCY IN THE VERDICT

Defendant claims the jury, by failing to reach a verdict on the conspiracy count, must have been acting under erroneous instructions. What the erroneous instructions were he does not say.

He says in effect that the jury should not have found defendant guilty of attempted robbery, since he was an aider and abettor if guilty at all, unless they found him also guilty of conspiracy.

The failure of the jury to return a verdict on the conspiracy count had no effect on the verdict actually returned.

Defendant could have been charged and convicted of attempted robbery without having been charged with conspiracy; that was the practical effect of the failure of the jury to agree on the conspiracy count.

Neither crime is a necessarily included offense in the other. Even an acquittal on the conspiracy charge would not have had the effect contended for by defendant. (*People* v. *Lyons,* 50 Cal.2d 245, 260 [324 P.2d 556]; *People* v. *Talbot,* 220 Cal. 3, 21 [28 P.2d 1057].)

This part of defendant's claims, therefore, merges into his claim that the evidence was insufficient to support the verdict.

RELEVANCY OF THE PRIOR OFFENSE

The case against defendant is purely circumstantial.

Defendant obtained the use of the car that finally reached a position where, with defendant as a passenger, it was conveniently located with relation to the scene of an attempted robbery and for use as a get-away vehicle; from that car, in that position, the robber went immediately to the scene of the attempted robbery, and returned immediately after the attempted robbery and reentered the car.

When the robber left the car he carried with him a pistol which belonged to a third person in the car and had been obtained only a few minutes before the attempted robbery from a pawnshop to the location of which defendant, the robber, and the owner of the pistol, rode in the car; when the robber returned to the car following the attempted robbery, he somehow got rid of the pistol, which was found under the seat space occupied by defendant.

The robbery occurred near the intersection of two one-way streets, E Street, one-way for eastbound traffic, and Fifth Avenue, one-way for northbound traffic; after leaving the pawnshop location, the car was being driven east on a one-way street for eastbound traffic two blocks south of E Street; when it had passed Fifth, the robber directed it to be driven to the next street for northbound traffic and on that street the car passed E to Broadway on which it went west to Fourth Avenue, one-way for southbound traffic, and from Fourth east on E past the bus, where the attempted robbery occurred.

After the robber reentered the car and the pursuing police were alongside it, a direction by the police for the person to step out who occupied the right rear seat, in which position. the robber was then seated, was obeyed by defendant, either through misunderstanding or for some other reason; and defendant again started to get out when the police removed the robber from the car.

■ Were the circumstances attending the prior robbery such that those circumstances are relevant to the question of his knowing encouragement of or aid to the robber; and to the involved question of the intent with which he participated in the whole series of events?

The circumstances in the prior robbery make it incredible that defendant, owner of the car which had the convenient recess in the thickness of the seatback, and who was in the car when the robbers entered it after the attempted robbery, was not a participant in the crime.

Some of the circumstances in the earlier offense are sufficiently similar to those in the attempted robbery by Crosby that possible inferences that defendant knew what Crosby intended and was giving his assistance to the extent necessary are strengthened by those similar circumstances.

Where knowledge is an issue on the question of guilt, as in the case of an aider or abettor, evidence of participation in a prior similar offense is relevant. (Wigmore on Evidence (3d ed.) §§ 300-301, pp. 192-194.)

### The Use of the Product of the Alleged Illegal Search as Proof of the Former Offense

Defendant, in testifying, stated on direct examination that he had been driving his car when arrested in connection with the 1964 robbery. He did not deny that he had given his express consent to the second search of his car. The second search followed promptly the second consent to search.

Because of the presence of express consent, the cases cited by defendant are not particularly apposite.

In that important respect, the facts are different from those in *Preston* v. *United States,* 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881] ; *Nugent* v. *Superior Court,* 254 Cal.App.2d 420 [62 Cal.Rptr. 217] ; *People* v. *Henze,* 253 Cal.App.2d 986 [61 Cal. Rptr. 545] ; *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] ; *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].

It is argued that no consent was given to the first search, since the request was to "look into" the car; that the first

search was not incident to a lawful arrest, there having been no probable cause to arrest; that the second search, even if considered a continuation of the first, suffered from the same infirmities as the first search, and that the supposed consent to the second search was not freely given, since the request to search followed a statement by the officer that he would have to get out and search the car again.

The trial court's ruling on the admissibility of the result of the second search was made after the court had heard testimony, at defendant's request, outside the presence of the jury.

 If defendant is correct that he did not understand the officer's question as a request for consent to search, there was, before the search was made, probable cause to make the arrest that followed the preliminary search. However, the inference that defendant understood he was being asked for consent to search was a permissible one.

The defendant at trial gave no testimony on the subject. We cannot say as a matter of law that the officer's remark that he would have to search the car again was a false assertion of a right to search. *Bumper* v. *North Carolina*, 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], does not compel such a holding. Where it does not appear as a matter of law the consent was involuntary, the determination is for the trier of fact. (*People* v. *Michael*, 45 Cal.2d 751 [290 P.2d 852].)

 We are of opinion, moreover, that the reasons given for interrupting the original search were sufficient to justify a resumption of that search and its completion at the same place after the lapse of one hour that had been spent in removing the suspects to jail, having them booked, and in returning to the scene. The action of the officer was wholly reasonable. (*People* v. *Webb*, 66 Cal.2d 107, 126 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].)

There is some ambiguity in Addington's testimony as to whether defendant and his companions were arrested and placed in the police cars before or after the initial search.

Defendant also asserts the car was never impounded. There was testimony that it was said it would be impounded; none as to the actual impounding. It seems unlikely it was left standing on the highway indefinitely.

A point is made by defendant that no one was left in charge of the car while the suspects were being carried to the police station. If that is meant to suggest that someone in the interval placed the pistol and money in the car, we reject it as

being unlikely, and at best merely raising a question of fact.

There was no error in admitting the evidence produced by the second search or the other evidence relating to the prior offense.

### SUFFICIENCY OF THE EVIDENCE

We are not to say that the jury's failure to return a verdict on the conspiracy charge establishes that the evidence was insufficient to support either the conspiracy charge or the attempted robbery charge. The failure to reach a verdict did not establish anything in that regard.

From a recital of the evidence, its sufficiency to support the verdict is apparent. Not least to be considered are the inconsistencies between defendant's accounts of how the gun got under the seat. We need not again detail the testimony.

Judgment affirmed.

Coughlin, Acting P. J., and Ault, J. pro. tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.