[Crim. No. 5624.   Second Dist., Div. One.   Dec. 27, 1956.]

THE PEOPLE, Respondent, v. KENNETH P. SCHMIDT, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Robert Charles Lutz, Deputy District Attorney, for Respondent.

FOURT, J.—This is an appeal by the defendant from the judgment of conviction and the order denying a motion for a new trial.

In an information, the defendant was charged with 15 counts of grand theft and with two counts of violating the Corporations Code. The defendant pleaded not guilty and the matter proceeded to trial with a jury, which found him guilty of grand theft as charged in counts V, VI, VII, VIII and XII, and not guilty as to all other counts.

Count V charged that the defendant took the sum of $10,330.88, the property of Mutual Savings and Loan Association, a corporation (hereinafter referred to as "Mutual"), on or about January 22, 1953; count VI charged that the defendant took the sum of $6,000, the property of Kenneth P. Schmidt Builders, Inc., a corporation, and Southwest Savings and Loan Association, a corporation (hereinafter referred to as "Southwest"), on or about February 25, 1953; count VII charged that the defendant took the sum of $5,132.44, the property of Kenneth P. Schmidt Builders, Inc., a corporation, and Mutual, on or about February 24, 1953; count VIII charged that the defendant took the sum of $4,762.25, the property of Mutual, on or about March 6, 1953; count XII charged that the defendant took the sum of $3,150, the property of Kenneth P. Schmidt Builders, Inc., a corporation, on or about March 6, 1953.

A résumé of the facts is as follows: Kenneth P. Schmidt Builders, Inc., hereinafter referred to as "the Corporation," was incorporated in California in 1947. The defendant was president of the corporation from its inception to July, 1953, at or about which time it went into involuntary bankruptcy.

There were various other officers of the Corporation from time to time, among them being Lucille Clark, who was a vice-president and also a secretary to the defendant, Stanley Schmidt as secretary-treasurer, and after January 5, 1953, Kenneth Bohard as secretary-treasurer. From 1947 to April 30, 1953, the defendant was never a licensed contractor in California. However, the corporation was licensed with Bohard and Stanley Schmidt, a brother of the defendant, as the responsible managing employees during the period July, 1952 to July, 1953. The corporation had a minute book and stock transfer book, although neither was produced at the trial. There was a conflict in the testimony as to the ownership of the stock, the defendant stating that it was all owned by him personally, and at the same time the books of the corporation indicated that the defendant owned about 85 per cent of the stock, and further there was testimony that Stanley Schmidt was an owner of stock in the corporation at the outset of the building projects of the corporation in 1952. Early in 1952 the corporation prepared to construct 77 houses in tract 17209 in the city of Monterey Park, California. The defendant conducted negotiations for the corporation with Mutual and Southwest. On July 1, 1952, the corporation entered into an agreement with Mutual in which the latter was to loan to the corporation money for the construction of dwellings on each of twenty lots in tract 17209. On August 15, 1952, the Corporation entered into agreements with Southwest wherein the remaining fifty-seven houses in tract 17209 were to be financed by Southwest. Each of the agreements as between Southwest and the Corporation contained a trust clause which read in part as follows:

". . . The undersigned, and each of them agree that all funds received hereunder are received in trust for the purpose of paying in full all contractors and/or material men and/or laborers (other than the undersigned) then or theretofore engaged in said construction; and that the undersigned shall not have any beneficial interest in said funds unless and until said purpose has been fulfilled."

On April 18, 1952, a bank account was opened for the Corporation by corporate resolution of April 14, 1952, at the Monterey Park branch of the Bank of America. Dealings and transactions in regard to matters having to do with tract 17209 were in the name of the Corporation. Contracts were signed by the defendant in his corporate capacity and dealings were in the corporate name with the house buyers in tract

17209, and with material and labor contractors. Accounts in the books of the Corporation showed that there was $59,888.77, which was received as payments from house buyers which was used by the Corporation for general expenses, including personal expenses of the defendant, and which sums were not placed in escrow. The defendant, acting for the corporation, bought the land (Tract 17209) from the Security Development Company for $89,600, but executed a corporate note in that sum for the purchase price. The note was to be repaid at the rate of $1,500 from an escrow on each lot as it was sold.

The check records of the corporation and other exhibits disclose that there were various expenditures on a personal residence of the defendant in Pasadena, and such checks were posted to the general ledger account of the corporation. The personal residence of the defendant was never an asset of the corporation before May 22, 1953, at which time it was deeded to the corporation. Before that time, namely on April 1, 1953, the defendant had sought to divest himself of any interest he might have had in the house by executing a grant deed of his right, title and interest to his wife, Mary W. Schmidt. There were expenditures of large sums of corporate funds on the yacht ''Hilaria,'' which was owned by the Harrison Finance Company and the defendant as an individual, and not by the corporation. A race horse, ''Pusan,'' was carried on the books of the corporation, having been purchased with $4,000 of corporate moneys, and various expenditures were made on the race horse from corporate funds. No money came into the corporation from activities of the horse with the exception of a cash deposit by the defendant in December of 1952, which apparently was the winnings, or a part of such, from a wager made on the horse when it ran at the Tanforan Race Track.

There is no contention that there were any corporate resolutions authorizing the purchase of a race horse, expenditures thereon, expenditures on a yacht, expenditures for living expenses, nor for a personal residence for the defendant, and expenditures thereon.

The funds received by the corporation from Mutual and from Southwest were to be used solely for the construction of houses and not for preliminary expenses nor personal expense, and the proceeds of these loans were set up in the corporate books as funds held in .trust.

The ledger sheets and deposits slips of the corporate bank account showed a pattern of expenditures, and considered with the books of the corporation, showed that the books accurately reflect the business of the corporation as to deposits and withdrawals of corporate funds, with the exception of some defalcations on the part of the defendant where information was kept from the employee of the corporation charged with making entries in the books.

During the period from January 22, 1953, to March 6, 1953, the defendant made withdrawals from the corporate account for personal expenses in the amount of about $45,000. These consisted of expenditures on the yacht ''Hilaria,'' expenditures on the personal residence of the defendant, cash withdrawals, expenses of race horses, and living expenses, as well as the sum of $5,132.44, as charged in count VII, and $3,150, as charged in count XII, which sums were never deposited in the corporation account and no information was given to the employee of the corporation charged with making entries in the corporate books.

The defendant was fully aware that the corporation was unable to meet its bills for material, labor and construction costs on tract 17209, and particularly the bills and debts in respect to the lots on which funds were advanced by the loan company.

As to count V the evidence showed that the loan from Mutual to the corporation of July 1, 1952, included Lots 48 and 51 through 57 of tract 17209, and that in accordance with the contract and in reliance upon the representations by the defendant to Mutual that all bills were paid for construction and labor on the lots above set forth, a check was issued by Mutual to the corporation for $10,330.88, and the funds were received by the corporation. The representations so made by the defendant were false, as shown by the books of the corporation as of January 22, 1953, and the funds were not used for the purposes for which they were paid to the corporation by Mutual, but were used by the defendant for his own purposes as hereinafter related.

As to counts VI and VII, the evidence showed that Southwest had agreed to loan to the corporation about $372,000, in accordance with the agreement of August 15, 1952. In keeping with the trust clause an advance to the corporation was made of such trust moneys by Southwest in the sum of $20,000, on February 25, 1953. This sum was deposited in the corporation account at the Monterey Park branch of the Bank

of America on February 25, 1953, and the defendant, on the same day, received $6,000 cash from the corporate bank account on a counter-receipt, and that money was paid from the trust moneys of Southwest. The $20,000 would not have been paid to the corporation by Southwest if it had been known that the money would not be used for payment of bills on the particular lots. On the same day, February 25, 1953, the defendant cashed a check payable to the corporation which had been issued by Mutual in accordance with the loan agreement of July 1, 1952, in the sum of $5,132.44, receiving cash for it by having a locker room attendant at a country club serve as an accommodation endorser on the check. No information was given to the employee of the corporation charged with making the proper entries on the corporate books of this check. The check from Mutual was paid under the terms of the agreement in reliance on the representation by the defendant that all of the bills were paid. The representation was false.

It would appear that the defendant had at least $11,132.44 in cash in funds of the corporation in his possession on February 25, 1953. On February 27, 1953, the defendant gave about $1,000 to a Raymond Thomas, a horse trainer, for the purchase of a race horse named ''Digno,'' and the defendant gave $1,129.50 to the sheriff of Los Angeles County to release an attachment on the race horse ''Pusan,'' which was then running at the Santa Anita Race Track. Further, on February 27, 1953, the defendant paid $2,400 in cash to the Balboa Bay Club.

As to count VIII, the evidence showed a receipt by the corporation of $4,762.25 from Mutual (tract 17209) on March 6, 1953, which sum was paid to the corporation in reliance upon the defendant's representations that all of the bills were paid. The representations were false, and the funds were used as hereinafter set forth.

As to count XII, the evidence showed that in accordance with an agreement between the corporation and Mutual for construction loans on 29 houses to be constructed in Tract 10409, Mutual delivered a check dated March 5, 1953, for $3,150, to the corporation. The defendant cashed the check at the Bank of America, Monterey Park branch, on March 6, 1953, and did not deposit the money in the corporation account or use it for corporation purposes.

The defendant contends that the evidence is insufficient to support the verdicts. Considering first the contention as it

pertains to count V, appellant states that the evidence does not disclose that Mutual ever lost the money in question. ■ It has been held in cases of this type that it is not necessary to show that the victim was actually out of pocket. (*People* v. *Pugh,* 137 Cal.App.2d 226, 233 [289 P.2d 826]; *People* v. *Gloster,* 102 Cal.App.2d 872, 874 [228 P.2d 578].) Further, appellant asserts that the president of Mutual was not necessarily cognizant of the particular transaction. The testimony was such that the jury could, and obviously did, conclude that the president was in a position to speak for Mutual, and that the loans would not have been made otherwise than under the conditions which were represented to them as being the truth. If there were any discrepancies or contradictions, it was up to the jury to determine such. (*People* v. *Gloster, supra.*) ■ Furthermore, it is not essential that there be express testimony by the victim that he was induced to part with money by the false representations of the accused. As said in *People* v. *Frankfort,* 114 Cal.App. 2d 680, at page 699 [251 P.2d 401]: "This is not true. '. . . the express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential. It is sufficient if the inference of his reliance could have been drawn from all of the evidence.' (*People* v. *Gordon, supra* [71 Cal.App. 2d 606 (163 P.2d 110)]; *People* v. *Schmidt,* 79 Cal.App. 413, 418 [249 P. 832, 250 P. 1104]....)" **[3]** Appellant further makes the claim that Mutual did not deliver the money to him nor to the corporation; that in fact, Mutual issued its check to the corporation, which in turn deposited the check in the bank to its credit, and the funds thereby went into the general funds of the bank. There is no merit in this contention. (See *People* v. *Frankfort, supra; People* v. *Hatch,* 163 Cal. 368, 375 [125 P. 907].) The money was, without question, in large part under the control of the defendant, even though it was, for a time, in the physical possession of the bank. It has been held that it was not necessary to show that the defendant himself actually took the full amount in question, or that he benefited personally. (*People* v. *Jones,* 36 Cal.2d 373, 381-382 [224 P.2d 353]; *People* v. *Ashley,* 42 Cal.2d 246, 259 [267 P.2d 271]; *People* v. *Cheeley,* 106 Cal.App.2d 748, 752-753 [236 P.2d 22].)

Referring next to count VI, appellant contends that there was no theft from Southwest because Southwest transferred the money to the corporation without requiring any special

setup directing how the funds were to be used and that therefore the funds became the property of the bank. Appellant further sets forth that the money was used to carry on a collateral business matter in the name of the corporation and that the appellant had a right to have a drawing account for salary and otherwise, and also that the corporation was the *alter ego* of the defendant. We have already discussed a part of the appellant's contentions under count V. It is clear from the evidence that the defendant applied moneys to uses and for purposes entirely different from that for which they were received. There was the requisite parting with the moneys by Southwest. The agreement between Southwest and the defendant contained a trust clause specifying that the funds received in trust were to pay contractors, materialmen and laborers. ▆ It was appropriately said in *People* v. *Pierce,* 110 Cal.App.2d 598, at page 609 [243 P.2d 585] : ". . . Any diversion of funds held in trust constitutes embezzlement whether there is direct personal benefit or not as long as the owner is deprived of his money. (*People* v. *Talbot,* 220 Cal. 3 [28 P.2d 1057] . . .; *People* v. *Braiker,* 61 Cal.App.2d 406 [143 P.2d 89] . . . .)" ▆ The jury could reasonably conclude that the purchase of race horses, running them at various race tracks, wagering on them, supporting a yacht and moneys to a yacht club were not wholly related to the legitimate business of the corporation. ▆ In respect to the showing of theft from the corporation, it is sufficient that the appellant took the money of the corporation for personal use without authorization. (*People* v. *Moorhead,* 104 Cal.App.2d 688, 694 [232 P.2d 268].)

▆ In respect to the claim that the Corporation was defendant's *alter ego,* the jury had ample evidence from which they could, and did determine that there was a distinct, formal corporate existence. However, even where the circumstances indicate that all of the capital stock of a corporation is owned or controlled by one person, this does not necessarily destroy its separate existence. (*Erkenbrecher* v. *Grant,* 187 Cal. 7, 11 [200 P. 641].) In the case of *People* v. *Talbot,* 220 Cal. 3, at page 14 [28 P.2d 1057], the court said, among other things : " 'The element of felonious intent in every contested criminal case must necessarily be determined from the facts and circumstances of the case. (*People* v. *Kirk,* 94 CalApp. 378 [271 P. 347] . . . .) In our opinion the law is well expressed in the case of *Mangham* v. *State,* 11 Ga.App. 427 [75 S.E. 512, 516], where the court says: "An officer or agent of a corporation

cannot take money of the corporation which is entrusted to him, or which comes into his possession by virtue of his office or agency, and use it even temporarily for his personal benefit and avoid criminal responsibility by calling it a loan. The law calls such a transaction a wrongful conversion, from which a fraudulent intent can be inferred." (Citing cases.)' ''

In *People* v. *Foss*, 7 Cal.2d 669 [62 P.2d 372], the appellant contended that he was a member and officer of the club involved, and that as one of the owners thereof, he could not embezzle from himself. The court said, at page 670: ''The profits or proceeds from the sale of the tickets for the performance to be given were primarily for the erection of or securing a clubhouse. It therefore appears that appellant was neither a partner nor one engaged with others in a joint enterprise. He falls within the definition of an 'Agent,' given in section 2295 of the Civil Code as 'one who represents another, called the principal, in dealings with third persons.' In the transactions here complained of, and of which appellant was guilty, he was acting for and representing the Pasadena Stage and Screen Club. It has been found that he fraudulently appropriated money rightfully intended for, and the property of, the club, and he was guilty of embezzlement as defined in sections 503 and 504 of the Penal Code.''

As to the remaining counts, appellant simply repeats the matters which have already been disposed of.

█ With reference to the argument that the court erred in not compelling the People to make an election as to whether they were proceeding on the basis of theft by larceny, false pretenses or embezzlement, in our opinion an election is not required. In *People* v. *Fewkes*, 214 Cal. 142, at page 149 [4 P.2d 538], the court said: ''The information charged the offense as 'Grand Theft, a felony, committed as follows' (reciting the particulars), under the authority of sections 484, 490a and 952 of the Penal Code as amended and added in 1927 (Stats. 1927, pp. 1043, 1046, 1047). This was sufficient. (Citing cases.) It is not necessary that the information state the kind of grand theft with which the defendant is charged in order to comply with subdivision 2 of section 950 of the Penal Code. (*People* v. *Manchell*, 91 Cal.App. 788 [267 P. 718] . . . .)

''Under the new procedure it is obviously unnecessary and improper to compel the district attorney in advance of the proof, to elect upon what theory the prosecution is to proceed, whether larceny, false pretense, trick and device, embezzle-

ment, etc. These distinctions in the charge and proof obtained under the old practice, but are done away with in the new. They were eliminated, not only for the purpose of simplifying procedure, but also to relieve the courts of the necessity of drawing fine distinctions as to whether the particular crime charged had been proved, and the prosecution of charging in advance, at its peril, an offense which the evidence, because of such fine distinctions, might show not to exist although the guilt of the defendant be manifest. (*People* v. *Myers, supra* [206 Cal. 480 (275 P. 219)].)''

Also, in *People* v. *Ashley,* 42 Cal.2d 246, at page 258 [267 P.2d 271], the court stated: ''Although the crimes of larceny by trick and device and obtaining property by false pretenses are much alike, they are aimed at different criminal acquisitive techniques. Larceny by trick and device is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession. (Citing cases.) In this state, these two offenses, with other larcenous crimes, have been consolidated into the single crime of theft (Pen. Code, § 484), but their elements have not been changed thereby. (Citing cases.) The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. Indictments and informations charging the crime of 'theft' can now simply allege an 'unlawful taking.' (Pen. Code, §§ 951, 952.) Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved. (Citing cases.) The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses.''

Further, in our opinion, it was not error to omit an instruction that the verdict must be unanimous as to the type of theft committed. (*People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897].)

Appellant asserts that the court erred in overruling his objections to the introduction into evidence of certain books, documents and records of the loan associations, on the ground that there was no proper foundation laid. We are of the opinion that under the provisions of Code of Civil Procedure, section

1953f, the evidence was properly introduced and that the language used in *People* v. *Fowzer,* 127 Cal.App.2d 742, at pages 747-748 [274 P.2d 471], is appropriate, where the court said: ''The records here in question were not rendered inadmissible by failure to preliminarily show that the witness was the actual custodian thereof. Section 1953f of the Code of Civil Procedure specifically provides that such records shall be competent evidence '. . . if the custodian *or other qualified witness* testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.' (Emphasis added.)

''The hard and fast rule that the custodian of the records must be produced is specifically dispensed with by the statute. Undoubtedly the Legislature determined that such a rule provoked undue interference with the operation of business enterprises and was unnecessary to insure reliable evidence. In the words of our Supreme Court in *Loper* v. *Morrison,* 23 Cal.2d 600, 608, 609 [145 P.2d 1] : 'It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event. It is not necessary that the person making the entry have personal knowledge of the transaction. (Citing cases.)' See also *Nichols* v. *McCoy,* 38 Cal.2d 447, 449, 450 [240 P.2d 569] . . . .

''Where, as in the case now before us, the determination of the trial court that the foundation laid was sufficient is a deduction reasonably drawn from the evidence, such conclusion is binding upon an appellate court (citing cases). In the case at bar the testimony of the witness that he was an officer of the bank and had access to the records is quite sufficient to support the ruling of the trial judge. From the testimony given by the assistant cashier of the bank it could well be inferred that the records were prepared in the usual manner and regular course of the bank's business. As was said in *Thompson* v. *Machado,* 78 Cal.2d 870, 873 [178 P.2d 838] . . .: ' ''. . . In the case of the conduct of the business and affairs of an establishment, it is presumed that the regular course of business of such establishment is followed (Code Civ. Proc., § 1963, subd. 20) and that the books and records of an establishment truly reflect the facts set forth in such books (Code Civ. Proc., § 1953f).'' ' ''

We are of the opinion that there is no merit in the remain-

ing contentions of the appellant, and further that the jury was fully and fairly instructed, and that there was no prejudicial error in the case.

Judgment and order are, and each is, affirmed.

White, P. J., and Nourse (Paul), J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 23, 1957.

*Assigned by Chairman of Judicial Council.