[No. A030302. First Dist., Div. Three. Dec. 18, 1986.]

COUNTY OF SONOMA, Plaintiff and Respondent, v.
GRANT W., Defendant and Appellant.

**1442**

**COUNSEL**

Paul A. Neuer for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady, Lawrence K. Sullivan and Gloria F. De Hart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BARRY-DEAL, J.**—Grant W. appeals from a judgment determining that he is the natural parent of a minor child, Jessica M. Appellant contends that a laboratory report was improperly admitted into evidence without a proper foundation and that a report of the blood test results was inadmissible hearsay. We affirm the judgment.

I

In February 1983, the County of Sonoma (County) filed its complaint alleging that appellant was the natural father of a minor child, Jessica M., born September 25, 1982, and seeking a determination of paternity, reimbursement of public assistance paid on the minor's behalf, and an order for ongoing support. On January 4, 1984, the trial court approved a stipulation entered into by appellant and the County, in which appellant agreed to submit to human leukocyte antigen (HLA) blood tests to determine the probability of appellant's paternity of the child. Under this stipulation, blood of all three parties involved—appellant, Jessica, and Jean M., the child's mother—would be drawn at Redwood Medical Laboratory in Santa Rosa and analyzed at Irwin Memorial Blood Bank (Irwin) in San Francisco. The parties stipulated that the results of the HLA testing and written reports thereof would be admissible as evidence in any proceeding brought by either appellant or the County in which Jessica's paternity was an issue.

Although the subject blood samples were drawn at Redwood Medical Laboratory, the County sent the samples to Roche Biomedical Laboratories

(Roche) of Burlington, North Carolina, for analysis, contrary to the stipulation and without the approval of appellant or his trial counsel.[1]

Trial before the court, sitting without a jury, commenced on July 10, 1984. Appellant, called as an adverse witness by the County, testified that he first met Jean M. at a bar in Guerneville in November 1981, but that he never dated her, spent the night with her, or had sexual relations with her. At some point thereafter, he received a letter from her stating that she was pregnant and that he was the father. He did not respond to this letter for two or three months, until after attempts were made by the sheriff's department to serve him with papers. He then telephoned her and met her at a club in Guerneville to discuss her claim. At that time she told him that "she was sorry" that appellant "had gotten involved," and that "there was nothing that was going to become of it"; he responded, "Fine. I don't have any idea what you're talking about or what is going on."

Jean M. testified that she first met appellant at Pat's Bar in Guerneville in November 1981, although she had seen him previously that summer. They went to appellant's house and had sexual intercourse, spending the night together. She had a regular menstrual period after that encounter. In mid-December, Jean M. met appellant at either the same bar or at a party and again left with him. This time, they spent the night at his new house, again having sexual intercourse. Neither appellant nor Jean M. used any means of birth control on either occasion of sexual intercourse. She had not had sexual relations with anyone besides appellant during the six-month period prior to December 1981; however, she did have sexual intercourse once with a Johnny S. one week after the second incident with appellant. Thus, she testified that during the six months before and the six months after conception, she had sexual intercourse a total of three times with only two individuals.

Jean M. first discovered that she was pregnant in mid-February 1982, when she saw a doctor at a clinic in Santa Rosa after missing a menstrual period. She contacted an obstetrician, who assisted her in determining that the approximate date of conception was in early or mid-December 1981. She had appellant's name put on Jessica's birth certificate because she "just felt" that he was the father. She testified that Jessica's eyes are brown like appellant's, and unlike her own hazel eyes and the hazel eyes of Johnny S.

---

[1]The decision to send all blood samples to Roche had been made by the Sonoma County Family Support Unit shortly after the parties entered into the stipulation, apparently for the reason that Roche did the testing at rates substantially less than those charged by Irwin in San Francisco. The court, in its memorandum of decision, quoted the testimony of Dr. Geyer to the effect that Roche is a national laboratory which does paternity testing for counties in 42 states, has done over 45,000 cases since 1980, and averages 144 analyses each day in an average 5-day week.

Jean M. testified that about one week before she was due to deliver, she wrote a letter to appellant informing him of her pregnancy and stating that he was the father. Several months later, after the child was born, appellant telephoned her and arranged a meeting in Guerneville; when they met, appellant questioned his paternity. Subsequently, Jean M. saw appellant at a New Year's Eve party on the night of December 31, 1983. She testified that at this time, appellant did acknowledge paternity by saying that if the blood tests which were being taken in connection with the litigation were "conclusive," then he would acknowledge the baby as his and "would be willing to take care of everything and not to worry."

Kathy Palmer testified that she was with Jean M. on two different occasions when they met appellant in Pat's Bar: once approximately one week before Christmas 1981, and the second time about a month later. On the first occasion, Ms. Palmer heard appellant and Jean M. "talking about leaving together" as they were all walking outside the bar at the end of the evening; however, she did not see either of them drive away. The next day, Jean M. told Ms. Palmer that she had spent the previous night with appellant. The second time, Ms. Palmer saw Jean M. leave the bar in the company of appellant, but again she did not see either of them drive away. Jean M. later told Ms. Palmer that she had spent the night with appellant again.

Mark Headrick, called as a witness on behalf of appellant, testified that he and appellant lived as roommates in a converted barn throughout 1981, including the period at the end of the year. Mr. Headrick's bedroom adjoined appellant's, and there was only a partial wall separating the two; one could easily see and hear into one bedroom from the other, and there was very little if any privacy. Mr. Headrick testified that he could not recall Jean M. ever sleeping at the house in either November or December 1981, and that he could not remember appellant having any visitors who slept with appellant or in his bed during that time period. Mr. Headrick testified that although it would have been "possible" for appellant to have spent the night with someone in his bedroom, it was not "probable," because he was not a "heavy sleeper" and he would have overheard. Mr. Headrick testified that appellant moved out on Christmas Eve in December 1981, after an argument. Richard Dickinson confirmed that appellant moved into a rental apartment in the downstairs portion of his home on Christmas Eve 1981. He testified that he did not pay any attention to whether or not appellant had entertained any female visitors overnight because "[t]hat was none of my business."

Dr. James Geyer, a clinical immunologist employed as the director of the paternity testing department at Roche's North Carolina facility, was called as a witness with regard to the procedures employed in making the blood

tests at issue. He testified to the large scope of Roche's paternity testing program; the use of HLA blood tests in making "life and death medical decisions" in organ transplant operations; the characteristics of the HLA white blood cell testing; the strict quality controls on Roche's testing and procedures; the regulations with which Roche must comply; the regular onsite inspections of Roche's facilities; and the specific controls imposed on paternity blood tests. These include in-person identification of the individuals whose blood is being tested at the time of drawing the samples; identification of the tubes into which blood samples are drawn with labels that cannot easily be peeled off; the packaging of the boxes in which the samples are sent to the laboratory together with identification papers, photographs, and signed statements of the persons giving the blood samples; inspection of the boxes upon arrival at the laboratory for any signs of tampering; and identification on separate worksheets of the tubes by name, computer billing number, and the sequential number placed directly on the tube.

On the basis of the results of the HLA testing of the blood samples in this case, Dr. Geyer concluded that appellant could not be excluded as Jessica's father, and further that the statistical probability that appellant was the actual father was between 99.06 and 99.95 percent. Dr. Geyer's testimony on the specific test results was permitted by the trial court, subject to appellant's motion to strike on grounds of hearsay, failure to establish the chain of custody, and the County's violation of the stipulation regarding blood testing.

On October 22, 1984, the trial court issued its tentative decision finding beyond a reasonable doubt that appellant was the minor's father. A final judgment was filed on November 19, 1984.

## II

The use of the HLA blood test to prove paternity is by now well-established in California courts. In the case of *Cramer* v. *Morrison* (1979) 88 Cal. App. 3d 873 [153 Cal. Rptr. 865], the court found that the HLA white blood cell test produced far more specific and exact results than the Landsteiner red blood cell tests in common usage at that time, or, indeed, than any other blood identification test then available. (*Id.*, at pp. 881-882.) Unlike the earlier tests, which could only prove nonpaternity by excluding individuals from the group of possible fathers on the basis of their blood "type," the HLA test is capable of narrowing the field of potential fathers to an unprecedented extent. The HLA blood test alone can eliminate 78 percent of males wrongfully accused as fathers. When it is combined with 6 other blood group systems, this exclusionary factor increases to 93 percent, de-

pending on racial distinctions and variations. Moreover, depending on the scope of the tests, the relative rarity of the blood types, and the number of possible fathers, the statistical probability of paternity can actually reach 99 percent or higher. (2 Cal. Marital Dissolution Practice (Cont.Ed.Bar 1983) § 27.14, p. 1114.) Thus, not only can nonpaternity be proven much more conclusively, but statistically significant estimates of the probability of actual paternity can now be made. (*Cramer* v. *Morrison, supra,* 88 Cal.App.3d at pp. 877-878.)[2]

The *Cramer* court held that California law did not preclude the use of the HLA test to prove paternity as well as nonpaternity (*id.,* at p. 883); and that, in general, the possible prejudice of admitting the statistical results of HLA blood testing did not outweigh the probative value of such results, which should therefore not be excluded from evidence on that basis. "We are not aware of any public policy which would require exclusion of highly probative scientific evidence on the issue of paternity in the absence of a statutory mandate. On the contrary, all the policy considerations advanced by California commentators and case law argue for broad inclusion of such evidence in paternity proceedings. These considerations include protecting children from the stigma of illegitimacy, preservation of the family, and insuring that individuals rather than the government bear responsibility for child support. [Citations.]" (*Id.,* at p. 885.) However, the court went on to reaffirm its adherence to "the traditional test" for admissibility of expert testimony based on a "new scientific technique": "there must be a preliminary showing of general acceptance of a new technique in the relevant scientific community; the witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject; and the proponent of the evidence must demonstrate that correct procedures were used in the particular case. [Citation.]" (*Id.,* at p. 886.)

Subsequent to the decision in *Cramer* v. *Morrison,* the Legislature amended section 895 of the Evidence Code, one of the provisions earlier enacted by the Legislature as part of the Uniform Act on Blood Tests to Determine Paternity. ■ Section 895 now states: "If the court finds that the con-

---

[2]The obverse of the exclusionary factor, sometimes referred to as the "inclusionary" result, is the statistical finding that an individual *cannot be excluded* as the father of the child at issue. The "probability-of-paternity" result is the statistical finding that there is a given numerical probability that that individual actually is the child's father. In the context of this case, the "inclusionary" result of the HLA blood test was that appellant is among that portion of the male population who could have fathered Jessica and therefore cannot be excluded as her actual father; the "probability-of-paternity" result was that there is a given percentage probability that he is in fact Jessica's father. The "probability-of-paternity" figure presented by Dr. Geyer in this case was between 99.06 and 99.95 percent and was based on the assumption that there was a 50 percent chance that the mother and appellant had had intercourse during the period of conception. (See *Everett* v. *Everett* (1984) 150 Cal.App.3d 1053, 1062-1063, 1069 [201 Cal.Rptr. 351].)

clusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, or if the tests show the probability of the alleged father's paternity, the question, subject to the provisions of Section 352, shall be submitted upon all the evidence, including evidence based upon the tests." Thus, this provision permits *all* blood test results, both inclusionary (or exclusionary) ones and probability-of-paternity percentages, to be admitted on the issue of paternity subject to the restrictions of Evidence Code section 352.

■　Recently, the Legislature has added a new section to the Evidence Code to provide that "[t]here is a rebuttable presumption, affecting the burden of proof, of paternity, if the court finds that the paternity index, as calculated by the experts qualified as examiners of genetic markers, is 100 or greater. This presumption may only be rebutted by a preponderance of the evidence. . . ." (Evid. Code, § 895.5; Stats. 1986, ch. 629, § 2.)[3] The effect of this provision, as was the express intent of the Legislature, is to shift the burden of proof of paternity to the putative father where the genetic evidence warrants a presumption that he is the actual parent.

■　There was ample evidence adduced at trial in the form of witness testimony to support the trial court's affirmative findings that Jean M. and

---

[3]The full text of the Assembly Bill enacting this new provision, as approved by the Governor on August 29, 1986, is as follows: "Section 1. It is the intent of the Legislature to standardize the process by which paternity is established in order to achieve a greater degree of equity and consistency in paternity determinations. The Legislature finds that the science of genetic testing has advanced to the degree that paternity determinations resulting from such testing are so reliable that the burden of proof can be shifted to the putative father.

"Sec. 2. Section 895.5 is added to the Evidence Code, to read:

"895.5. (a) There is a rebuttable presumption, affecting the burden of proof, of paternity, if the court finds that the paternity index, as calculated by the experts qualified as examiners of genetic markers, is 100 or greater. This presumption may only be rebutted by a preponderance of the evidence.

"(b) As used in this section:

"(1) 'Genetic markers' mean separate identifiable genes or complexes of genes generally isolated as a result of blood typing, at least seven of which are normally tested in a paternity determination.

"(2) 'Paternity index' means the commonly accepted indicator used for denoting the existence of paternity. It represents the mathematically computed probability that the putative father is the true father of the child, as opposed to any other man of similar ethnic background. The paternity index, computed using results of various paternity tests following accepted statistical principles for the computation of probability, shall be in accordance with the method of expression accepted at the International Conference on Parentage Testing at Airlie House, Virginia, May 1982, sponsored by the American Association of Blood Banks."

appellant in fact had sexual intercourse, and that it took place at a time when, according to the natural order of things, Jean M. could have conceived. The trial court could properly consider these findings in conjunction with the results of the Roche HLA blood test, in order to determine a meaningful probability-of-paternity percentage. (*Cramer* v. *Morrison, supra,* 88 Cal.App.3d at pp. 877-886; cf. *Everett* v. *Everett, supra,* 150 Cal.App.3d at pp. 1068-1073; *Alinda V.* v. *Alfredo V.* (1981) 125 Cal.App.3d 98 [177 Cal.Rptr. 839].)

III

 Appellant's first contention is that the trial court abused its discretion in admitting the Roche laboratory report into evidence in the absence of a proper foundation as to the chain of custody of the blood samples tested. Appellant stipulated at trial to the chain of custody as to the drawing of the blood samples from all parties in Santa Rosa, the labeling of the samples for identification, and their shipment by mail to North Carolina. However, he maintains that the chain of custody was broken thereafter, and that no foundation for admission of the evidence exists in the absence of testimony by the Roche technicians who actually performed the blood tests. In short, he contends that the County failed to establish that the blood tested by Roche in fact came from the parties to this lawsuit. The contention is without merit.

 The final determination of what evidence is admissible rests within the sound discretion of the trial court, and its decision will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. (Evid. Code, § 310; *Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 135 [125 Cal.Rptr. 59].) In the instant case, the trial court concluded that the County had presented an adequate foundation establishing the chain of custody of the blood samples, regardless of the fact that the Roche technicians who received and tested the samples did not testify and were not available for cross-examination. Substantial evidence supports the trial court's ruling.

 "It is rudimentary that a specimen taken from a human body for the purpose of analysis must be identified before such specimen or any analysis made from it attains standing as evidence of the condition of the person whose conduct is questioned. Without identification, there is no connection between the two." (*American Mut. etc. Co.* v. *Ind. Acc. Com.* (1947) 78 Cal.App.2d 493, 496-497 [178 P.2d 40].) In *People* v. *Crosslin* (1967) 251 Cal.App.2d 968, 975-977 [60 Cal.Rptr. 309], the court ruled that a fingerprint card purporting to show the defendant's fingerprints was admissible, even though the person who actually took the prints and made the card was

not called as a witness. The foundation for introduction of the fingerprint card was laid through the testimony of the captain in the county sheriff's office who had set up the fingerprint division in that office and who had himself taken fingerprints for many years. The captain identified the fingerprint card in question as the type used only by that office; described how the cards were prepared, what the various numbers on the card signified, and who prepared them; related how he had checked the date and numbers on the card to confirm that it was in the correct location and sequence; and stated that it was prepared in the normal course of business on the date the defendant in the case had been arrested. The court found that this testimony was sufficient to establish the proper foundation for the card's admission into evidence. (*Ibid.*)

In the instant case, the County laid the foundation for admission of the subject evidence through the testimony of Dr. Geyer, which established the reliability and trustworthiness of the Roche records, verified the authenticity of the records sought to be admitted here and attested to the strict identification procedures followed by Roche. The fact that the particular technologist, technician, or laboratory orderly who made the actual record of the subject tests has not been called does not preclude the admission of those tests. (*Nichols* v. *McCoy* (1952) 38 Cal.2d 447, 448-450 [240 P.2d 569]; *People* v. *Crosslin, supra,* 251 Cal.App.2d at p. 976; *People* v. *Gorgol* (1953) 122 Cal.App.2d 281, 296-302 [265 P.2d 69].)

Appellant cites *Madden* v. *Madden* (1958) 160 Cal.App.2d 422, 425 [325 P.2d 538], in which the court found trial court error in admitting blood test results. In that case, however, the samples were completely unidentified, and there was no evidence as to the identity of the person who drew the blood or of how long after it was drawn that tests were conducted. Such is not the situation here, where Dr. Geyer testified to the chain of custody—including the identification of the individuals who witnessed the drawing of the blood samples and packaged them for transmission to Roche, and who received the package at Roche and unpacked it—and how this chain of custody was documented. All normal bookkeeping entries in the chain of custody had been completed; all appropriate records and worksheets had been filled out, completed, and signed by the appropriate technologist; and the names and numbers on the test tubes used for the blood samples corresponded with the names and numbers on the technologists' worksheet. There is ample evidence as to the source of all blood samples; the identity and training of all persons within the chain of custody is known; and the procedures used by Roche to ensure accuracy and proper identification are well-documented. (See *Nichols* v. *McCoy, supra,* 38 Cal.2d at pp. 448-450; *People* v. *Gorgol, supra,* 122 Cal.App.2d at pp. 297-302.)

We conclude that even in the absence of testimony by the technicians who received and analyzed the blood samples, the testimony of Dr. Geyer provided a sufficient basis for the trial court's conclusion that Roche's procedures were so inherently reliable and trustworthy that a proper foundation was established as to the chain of custody of the blood samples.

### IV

Appellant's other contention is that the trial court erred in admitting the HLA test report into evidence because the report failed to meet the standards for admissible business records under Evidence Code section 1271. Like appellant's first argument, which it closely resembles, this contention is meritless.

Evidence Code section 1271 provides that evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the existence of the act, condition, or event if: (a) the writing was "made in the regular course of a business;" (b) it was made at or near the time of the occurrence of such act, condition, or event; (c) the custodian of the writing or some "other qualified witness" testifies to the identity of the writing and the mode of its preparation; and (d) the sources of the information and the method and time of the writing's preparation "were such as to indicate its trustworthiness."

■ The trial judge is invested with wide discretion in determining whether a proper foundation has been laid for the admission of business records under Evidence Code section 1271. (*Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 784 [142 Cal.Rptr. 1]; *People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 961 [118 Cal.Rptr. 362]; *Exclusive Florists, Inc.* v. *Kahn* (1971) 17 Cal.App.3d 711, 715 [95 Cal.Rptr. 325].) The exercise of that discretion will not be disturbed on appeal absent a showing of abuse. (*Exclusive Florists, supra,* at p. 716.) Where the trial court has determined that the foundation laid was sufficient to support the introduction of evidence under the business records exception, and the record reasonably supports this determination, its conclusion is binding on the appellate court. (*People* v. *Schmidt* (1956) 147 Cal.App.2d 222, 232 [305 P.2d 215]; *People* v. *Fowzer* (1954) 127 Cal.App.2d 742, 747 [274 P.2d 471].)

■ The report at issue here meets the requirements of Evidence Code section 1271. It records an act (blood analysis) and is offered to prove the occurrence of that act. It was made in the regular course of Roche's business and was produced at or near the time of the act. A custodian or "other qualified witness" has testified as to the identity of the report and its mode

of preparation, and his testimony provided substantial evidence of the trustworthiness both of the sources of information and the procedures employed in preparing the report.

Appellant's objection to the introduction of the report is based in part on the fact that Dr. Geyer did not personally analyze appellant's blood, but relied instead on findings communicated to him by Roche technicians; on this basis, he argues that the source of the information contained in the report is untrustworthy. We disagree.

Dr. Geyer's testimony that he was the director of Roche's paternity testing department, that he had the records of the actual testing of the blood samples at issue here, that he trained and supervised the technologists who performed the tests, and that he reviewed their work, was quite sufficient to support the ruling of the trial judge. From his testimony, it could reasonably be inferred that the records in question were prepared in the usual manner and regular course of Roche's business. "'In the case of the conduct of the business and affairs of an establishment, it is presumed that the regular course of business of such establishment is followed [citation] and that the books and records of an establishment truly reflect the facts set forth in such books [citation].'" (*Thompson* v. *Machado* (1947) 78 Cal.App.2d 870, 873 [178 P.2d 838]; see *People* v. *Schmidt, supra,* 147 Cal.App.2d at p. 232.)

The object of Evidence Code section 1271 is to eliminate the calling of each witness involved in preparation of the record and substitute the record of the transaction instead. (*People* v. *Williams* (1973) 36 Cal.App.3d 262, 275 [111 Cal.Rptr. 378]; *People* v. *Crosslin, supra,* 251 Cal.App.2d at pp. 974-975.) As stated by the court in *People* v. *Schmidt, supra,* 147 Cal.App.2d at page 232, with reference to former Code of Civil Procedure section 1953f, substantially identical in its pertinent language to Evidence Code section 1271: "'The hard and fast rule that the custodian of the records must be produced is specifically dispensed with by the statute. Undoubtedly the Legislature determined that such a rule provoked undue interference with the operation of business enterprises and was unnecessary to insure reliable evidence. In the words of our Supreme Court in *Loper* v. *Morrison* [1944] 23 Cal.2d 600, 608, 609 . . .: "It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event. It is not necessary that the person making the entry have personal knowledge of the transaction. (Citing cases.)" [Citation.]'" We conclude that substantial evidence exists as to the inherent reliability, accuracy, and trustworthiness of the procedures used by Roche.

■ Appellant further contends that the report was inadmissible under Evidence Code section 1271 because it was prepared in anticipation of litigation. The cases appellant cites, *Gee* v. *Timineri* (1967) 248 Cal.App.2d 139 [56 Cal.Rptr. 211] and *W. D. Rubright Co.* v. *International Harvester Co.* (W.D.Pa. 1973) 358 F.Supp. 1388, involved situations in which parties sought to introduce in evidence self-serving records which were outside the scope of their usual business activities and prepared specifically for litigation. In the instant case, the report admitted into evidence was prepared by Roche in its normal course of business; it was one of literally thousands of such records systematically produced in the regular process of its operation as a large medical laboratory. The report merely evidences tests conducted on the genetic composition of appellant's blood, the kinds of tests performed by Roche all the time.

Moreover, both sides stipulated to the use of precisely the kind of blood test employed here. The reports admitted in evidence simply recorded the results of those tests. The record is devoid of evidence that Roche had any reason or motive to favor one side or the other in this paternity dispute, or, indeed, that the records were actually produced in anticipation of litigation, as appellant asserts.

In short, the Roche report was properly admitted under the business records exception to the hearsay rule as provided by Evidence Code section 1271.

The judgment is affirmed.

White, P. J., concurred in the judgment.

Merrill, J., concurred.