Filed 5/1/13  In re R. H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>R.H.,<br><br>    Defendant and Appellant. | G045924<br><br>(Super. Ct. No. DL037927-013)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Nick A. Dourbetas, Judge.  Reversed and remanded.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

The juvenile court sustained a wardship petition after finding R.H. violated his probation by committing 23 instances of tagging property belonging to the City of Lake Forest (the City).  The case was primarily based on photographs and documents generated by a graffiti cleaning company the City hired.  The photographs were uploaded to a database maintained by the Orange County Sheriff's Department.  Before admitting the database evidence, the prosecutor called the City's public works manager, Luis Estevez, to establish the business records exception to the hearsay rule.  On appeal, R.H. asserts the juvenile court committed reversible error by admitting the hearsay evidence.  He is right.  We reverse the juvenile court's ruling and remand the matter for retrial.

I

In August 2010, R.H. was declared a ward of the Orange County Juvenile Court following his admission he committed three counts of petty theft.  R.H. was placed on supervised probation.  Over the next year, 12 more petitions were filed.  In September 2010, R.H. committed the offense of vandalism under $400 (Petition No. 2).  In October 2010, he again committed vandalism under $400 (Petition No. 3), violated his probation by failing to remain law abiding (Petition No. 4.), committed another act of vandalism (Petition No. 5), and possessed a small amount of marijuana and drove without a license (Petition No. 6).  R.H. admitted the allegations in these petitions, and the juvenile court ordered he continue as a ward of the court on supervised probation but with the condition he be confined to a juvenile institution for 30 days and pay a restitution fine.

In December 2010, Petition No. 7 was filed charging R.H. with second degree burglary, petty theft, and false representations to a peace officer.  The following month, Petitions Nos. 8, 9, and 10 charged R.H. with multiple counts of vandalism,

2

possessing a switchblade, and possessing an aerosol paint container. Petition No. 10 was dismissed because it was a duplicate filing. Petition No. 11, an amended subsequent petition, charged R.H. with five counts of vandalism causing damage of $400 or more (counts 1-5), and 18 counts of vandalism causing damage less than $400 (counts 6-23). In April 2011, the court granted the prosecutor's motion to dismiss Petition No. 11, but the charges were immediately refiled as Petition No. 13. In July 2011, the prosecutor filed a notice of probation violation (Petition No. 14), alleging R.H. tested positive for methamphetamine, participated in gang activities, associated with gang members, stayed out overnight without permission, and failed to report to probation and school without excuses for his absences.

Because this appeal concerns the evidence presented at the jurisdictional hearing on Petition No. 11, we will limit our summary of the underlying facts accordingly. Before the jurisdictional hearing, R.H. moved to exclude 23 photographs (exhibit 3), depicting graffiti in various places in the City, as lacking foundation unless the person who took the photographs testified as to their authenticity. He maintained that without such foundation, the photographs were inadmissible hearsay.

The prosecutor made the offer of proof that Estevez would testify and establish the admissibility of the photographs under the business records exception to the hearsay rule. He explained Estevez's job included tracking tagging incidents in the City, and he was qualified to testify about the process by which the City obtained the graffiti photographs. Specifically, when graffiti was reported to the City, employees would submit a work order to a cleaning company contracted by the City to photograph the graffiti before removing it, and the photograph would automatically be uploaded to the Orange County Sherriff Department's "TAGGER" system. Once the damage was repaired, the graffiti removal company sent the City an invoice for payment. The court determined Estevez was a qualified witness to lay the foundation for the business records

3

exception and the photographs were admissible. The court did not specifically rule on R.H.'s authentication objections.

At the contested jurisdictional hearing, Estevez testified he oversaw all maintenance operations for the City, including graffiti removal. He explained the City had a hotline to receive reports of graffiti. Estevez's secretaries were responsible for taking information received on the hotline and preparing work orders (with a tracking number) for the Bonanza Cleaning Company (Bonanza), a graffiti removal company that had a contract with the City for its services.

Estevez testified Bonanza did not independently remove graffiti, but waited for a work order from the City. It was contractually required to remove graffiti within 24 hours of notification in order to avoid a performance deficiency deduction of $250 per incident. Before removing the graffiti, Bonanza employees were required to use a GPS-enabled telephone with a camera to photograph the graffiti. Estevez stated Bonanza's photographs were automatically uploaded to the "TAGGER" database loaded on the cellular telephone. The Sheriff's Department created the database as a tool for the agency to review and track graffiti as it was reported. Deputies would monitor whether particular gang monikers were appearing in other cities.

Estevez noted the City had computer online access to the TAGGER database. Estevez reviewed the invoices Bonanza sent the City each month listing the work order calls and the corresponding cost of removal. The invoices relating to the 23 incidents were contained in exhibit 4. On cross-examination, Estevez stated public works inspectors verified the graffiti was removed a few times a week.

Exhibit 3 was a packet of photographs and a cover page listing 23 separate instances of graffiti, including the corresponding dates, their location in the City, and the tracking number for each city work order. The cover page also listed the monikers shown on each picture: The gang monikers most often contained in the photographs were "Bust," "Saigon," "Love" and "Bomber."

4

Deputy Carlos Barrientos spoke with R.H.'s mother in September 2010. She gave the deputy a bag containing aerosol spray can nozzles and a piece of paper bearing the moniker "BUST." Deputies Troy Feely and Dallas Hennessey were assigned to a special investigation team for crimes involving graffiti in the City. They used the TAGGER database. In October 2010, Feely saw the word "BUST" on a wall in an area where tagging commonly occurred. The moniker was written in large letters and there were smaller monikers written near it. This was not the first time Feely had seen the moniker "BUST," and he had seen it at different locations.

Hennessey used the TAGGER system and learned "BUST" was R.H.'s moniker. The deputy testified R.H. typically either printed or used a bubble style of writing and his letter "U" looked like the letter "V." Hennessey found on the database other incidents of R.H.'s graffiti, all having the unique stylized "U" and most of the graffiti was fairly centralized to within a quarter mile radius of R.H.'s residence. There were a few incidents of graffiti farther away from his house, the farthest being five miles away.

Feely and Hennessey went to R.H.'s apartment for a probation search to look for further evidence of graffiti. R.H.'s mother gave the deputies a notebook binder containing drawings and several monikers and tagging names, including "BUST," "TOKE," "TOKER," "MEME," "SAIGON," "LOVE," and "BCOA" (a reference to the Barrio Chico Orange Avenue gang). Feely later spoke with R.H. at a school run by the probation department in Santa Ana. Feely noticed R.H. had "MEME" written on his hand. They searched R.H.'s items in the classroom and found two sheets of paper bearing the word "TOKE" inside his folder. Hennessey opined this meant R.H. was also connected to that moniker.

After considering the evidence and argument from counsel at the jurisdictional hearing on Petition No. 11, the juvenile court found the vandalism allegations in counts 1 through 23 to be true. Thereafter, R.H. admitted committing the

5

crimes alleged in Petitions Nos. 7, 9, and 12, as well as the probation violation allegations in Petition No. 14. Counts 2 and 3 of Petition No. 7 and part of Petition No. 9 were dismissed.

The juvenile court continued R.H. as a ward of the court on supervised probation on the condition he spend 224 days in juvenile hall or jail on the A.S.E.R.T. program. The court determined R.H.'s maximum confinement time was 12 years and six months. R.H. was ordered to pay restitution and no longer associate with, or be in the same area as, anyone who was a member of the Calle Orange, Varrio Viejo Orange Avenue, or Varrio Viejo San Clemente gangs.

II

R.H. contends the juvenile court committed reversible error by admitting exhibit 3, containing hearsay photographs and documents relating to the 23 vandalism crimes alleged in Petition No. 13. R.H. maintains Estevez, a City employee, did not provide adequate foundation for the admission of the 23 photographs under the business record exception because Estevez was not a qualified witness, there was no evidence the documents were made at or near the time of the vandalism acts, and there was no evidence regarding the method or time of preparation of the photographs, such as to indicate their trustworthiness. He is right.

To be admissible, the photographs must get past the same basic evidentiary thresholds as any other evidence. They must be deemed relevant, authentic, and not more prejudicial than probative. In this case, there was no dispute the photographs were relevant and more probative than prejudicial to the case. The court did not rule on the issue of authentication but admitted the evidence as reliable hearsay under the business record exception. (Evid. Code, § 1271.)[1]

---

[1]     All further statutory references are to the Evidence Code.

Section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record. On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 308 [pathology report prepared by pathologist who worked in same office as qualifying witness deemed admissible business record].)

"[S]ection 1271 does not require that the person who gathered the information contained in a record to testify as custodian of that record. [Citations.] 'It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event. It is not necessary that the person making the entry have personal knowledge of the transaction. [Citations.]' [Citations.]" (*People v. Matthews* (1991) 229 Cal.App.3d 930, 940 (*Matthews*) [deeming mere retrieval of computer generated rap sheets inadmissible as business records of identification bureau].) Indeed, "Many business records are prepared through the activities of several persons, and one employee may report facts he or she knows to a second employee, who then records those facts in the regular course of business. [Citation.] So long as 'the person who originally feeds the information into the process [has] firsthand knowledge,' the evidence can still qualify as a business record. [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1012 [log sheets created by gatekeeper and his supervisor admissible business record].)

7

Here, the photographs were made in the regular course of Bonanza's business of graffiti removal. Bonanza's employees were contractually obligated to make a photographic record of the graffiti before removing it. As stated above, because the underlying purpose of section 1271 is to eliminate the necessity of calling all witnesses who were involved in creating the business record (in this case the individual photographers), generally the witness who attempts to lay the foundation is a custodian of the business record. In this case the "custodian" of the photographic record would be someone employed by Bonanza having the requisite firsthand knowledge of the business's photographic recordkeeping procedures.

The Attorney General recognizes Estevez, the City's public works manager, is not a "custodian" of the database of photographs but asserts Estevez was nevertheless a "qualified witness" who could testify about the trustworthiness of Bonanza's business records. Section 1271, subdivision (c), permits either the "custodian or other qualified witness" to testify as to the records' "identity and the mode of its preparation." We conclude Estevez was not a qualified witness. Estevez, having outsourced the job of graffiti removal, did not have the necessary knowledge of the underlying working, maintenance, or recordkeeping of the photographs. He lacked firsthand knowledge of Bonanza's recordkeeping procedures. Rather, Estevez's perceptions about the timing, conditions, and preparations of the graffiti database was based entirely on the City's *contractual* arrangement with Bonanza, i.e., what Bonanza promised its customer it would do. Estevez's mere opinion Bonanza likely complied with its contractual obligations does not qualify him to testify about Bonanza's actual practices.

The Attorney General's reliance on *People v. Lugashi* (1988) 205 Cal.App.3d 632 (*Lugashi*), is misplaced. That court considered the admissibility of bank records and rejected a new test for computer-generated business records proposed by the criminal defendant. The *Lugashi* court determined it was not necessary to require the proponent of computer evidence automatically inputted at the bank to introduce

8

testimony on the reliability and acceptability of hardware, software, and internal maintenance and accuracy checks as a prerequisite to admission of that computer data. (*Id.* at pp. 643-644.) The court noted other California courts, the majority of other state courts, and some federal courts had all rejected similar claims. (*Ibid.*) It reasoned, defendant's "proposed test incorrectly presumes computer data to be unreliable, and, unlike any other business record, requires its proponent to disprove the possibility of error, not to convince the trier of fact to accept it, but merely to meet the minimal showing required for admission. If applied to conventional hand entered accounting records, appellant's proposal would require not only the testimony of the bookkeeper records custodian, but that of an expert in accounting theory that the particular system employed, if properly applied, would yield accurate and relevant information." (*Id.* at p. 640.)

In the *Lugashi* case, the prosecution sought to introduce microfiche copies of computer tapes containing credit card account information because it related to an allegation of grand theft. (*Lugashi, supra,* 205 Cal.App.3d at p. 636.) The court determined there was no issue as to the authentication of these records because the bank statements were prepared in the regular course of banking business and in accordance with banking regulations, and therefore were in a different category than ordinary business records of a private enterprise. (*Id.* at p. 642.) The *Lugashi* court determined the proposed presumption of unreliability was particularly inapplicable where the records consisted of retrieval of computer-generated data rather than data stemming from manually input, human-generated data. (*Ibid.*)

In addition, the *Lugashi* court held an experienced credit card fraud investigator familiar with merchant authorization terminals, counterfeit cards, credit card sales, and the manner in which sales are records, could testify to the contents of computer entries of merchant queries and system responses. (*Lugashi, supra,* 205 Cal.App.3d at pp. 641-642.) Defendant argued the investigator was neither the official custodian of the

9

records or a computer expert able to explain or evaluate the bank's hardware or software and should not be permitted to rely on hearsay when testifying. (*Ibid.*) The court disagreed, stating the experienced investigator "personally produced the printed records from the microfiche. Although she did not do the 'dump' or physically convert the resulting tape into microfiche, she worked and spoke with those who did. She understood the records and interpreted them in great detail. She assembled the bank copies of the actual charges and compared them with the computer records. That some of her knowledge came from 'hearsay' discussions with fellow workers employed and trained by the bank and its computer component suppliers no more renders her testimony incompetent than if it resulted from reading 'hearsay' information manuals from the hardware or software manufacturers or Wells Fargo computer management. If [defendant] were correct, only the original hardware and software designers could testify since everyone else necessarily could understand the system only through hearsay." (*Ibid.*)

The case before us is not about the *reliability* of the electronic business records. The question raised on appeal is whether Estevez is a "qualified witness" under section 1271, to testify about the trustworthiness of ordinary business records of a private enterprise. Unlike the *Lugashi* case, the data in question here consists of more than the retrieval of automatic data inputs. The data here was photographic images, framed and created by Bonanza employees by using cameras contained on their telephones. R.H. is not challenging the hardware or software design of the TAGGER database.

The other cases cited by the Attorney General are inapt because they are factually distinguishable. In *Zuckerman v. Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1404 (*Zuckerman*) (overruled by statute on other grounds as stated in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 530), the court considered admissibility of a declaration filed in support of a summary judgment motion. The court determined the declarant was a "competent expert" because he was the loan service department manager

10

and one of the custodians of the records. (*Zuckerman, supra,* 187 Cal.App.3d at p. 1404.) The court reasoned the manager, familiar with his employer's business practices, had alleged sufficient facts to show he was competent to testify with respect to documents showing a contractual relationship between his employer and the plaintiff. (*Ibid.*) The court noted the manager was not attempting to testify as a computer expert. (*Ibid.*) This case did not address the criteria for a "qualified witness" under the hearsay exception provided in section 1271.

In *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 324, the court held the business records were reported by several people, and one employee responsible for inputting that information into the records was a "qualified witness" under section 1271. This case does not hold a person not employed by the business, but who has a contractual relationship with it, is a qualified witness. (*Id.* at pp. 323-324.)

In another case cited by the Attorney General, *Matthews, supra,* 229 Cal.App.3d at page 940, the court determined rap sheets could not be admitted as a business record due to the lack of a proper foundation. The court ruled the police department's fingerprint technician and custodian of records for the police department's identification bureau was not a qualified witness because he "neither compiled the information reflected in the rap sheets nor even described the mode of preparation of those records. Not only do the rap sheets lack certification, no testimony was adduced about how they were prepared or the sources of information used for the entries made. Had [the technician] identified the sources of information and the mode of preparation of the computer lists, the reliability and trustworthiness of the records would have been established. [Citations.]" (*Ibid.*) Estevez, who is not an employee of Bonanza, had no part in compiling the information reflected in the database, and his source of the information for its preparation was not firsthand. He was not in a position to establish the reliability or trustworthiness of the photographs.

11

Finally, the Attorney General asserts the *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439 (*County of Sonoma*), is instructive. We agree but conclude it actually further supports R.H.'s argument. In that case, defendant appealed a paternity judgment, objecting to the introduction of a blood test report as an admissible business record. Defendant's blood samples were drawn and sent to Roche Biomedical Laboratories (Roche) for analysis and to determine the probability of defendant's paternity. (*Id.* at pp. 1442-1443.) A clinical immunologist, employed as director of the paternity testing department of the laboratory, was called as a witness regarding the blood test results. (*Id.* at pp. 1444-1445.) Defendant objected to admission of the report on the grounds the director did not personally analyze his blood, but relied on findings communicated to him by other technicians, making the report untrustworthy. (*Id.* at p. 1448.)

The court in *County of Sonoma* disagreed, stating, "The report at issue here meets the requirements of . . . section 1271. It records an act (blood analysis) and is offered to prove the occurrence of that act. It was made in the regular course of Roche's business and was produced at or near the time of the act. A custodian or 'other qualified witness' has testified as to the identity of the report and its mode of preparation, and his testimony provided substantial evidence of the trustworthiness both of the sources of information and the procedures employed in preparing the report." (*County of Sonoma, supra,* 187 Cal.App.3d at pp. 1450-1451.) Specifically, the court noted the witness was qualified because as director of Roche's paternity testing department, "he had the records of the actual testing of the blood samples at issue[,] . . . he trained and supervised the technologists who performed the tests and . . . he reviewed their work . . . . From his testimony, it could reasonably be inferred that the records in question were prepared in the usual manner and regular course of Roche's business." (*Id.* at p. 1451.)

In contrast, Estevez does not directly supervise any Bonanza's employees creating the photographic database, he did not train the graffiti cleaners about how to

12

properly take and upload the photographs, and he did not review their work. In essence, he did not know the usual manner of Bonanza's business. Estevez's knowledge is based on terms of a contract between the City and Bonanza, what he has been told by other people at the City, and his general sense of what is supposed to be happen before the graffiti is cleaned up. We conclude Estevez's testimony did not provide substantial evidence as to the reliability, accuracy, and trustworthiness of the procedures used by Bonanza in generating its business records.

Reversal is required because exhibit 3 was improperly admitted under the business records exception to the hearsay rule. The documents and photographs contained in exhibit 3 were primarily relied upon to establish the 23 counts of vandalism. There were no other witnesses or evidence to support the 23 counts, except for Feely, who alleged he once saw R.H.'s moniker spray painted on a wall. The error was not harmless as it is reasonably probable R.H. would have obtained a more favorable result but for the error. (*People v. Watson* (1956) 46 Cal.2d 818, 837.)

Retrial is permitted. "'[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.,* incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. [Citation.]'" (*People v. McCann* (2006) 141 Cal.App.4th 347, 354-355.)

13

## III

The order is reversed and the matter remanded for further proceedings.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.